Kevin Díaz, OSB No. 970480
Email: kdiaz@aclu-or.org
**ACLU Foundation of Oregon**
PO Box 40585
Portland, OR 97240
Tel.: (503) 227-6928; Fax: (503) 227-6948

Nathan Freed Wessler (*pro hac vice*)
Email: nwessler@aclu.org
Ben Wizner (*pro hac vice*)
Email: bwizner@aclu.org
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500; Fax: (212) 549-2654

Attorneys for the Plaintiffs-Intervenors

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| **OREGON PRESCRIPTION DRUG MONITORING PROGRAM**, an agency of the **STATE OF OREGON**,<br><br>  Plaintiff,<br><br>  v.<br><br>**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION**, an agency of the **UNITED STATES DEPARTMENT OF JUSTICE**,<br><br>  Defendant. | Case No.: 3:12-cv-02023-HA<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR SUMMARY JUDGMENT**<br><br>Oral Argument Requested |

**JOHN DOE 1, et al.,**

        Plaintiffs-Intervenors,

               v.

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION**, an agency of the **UNITED STATES DEPARTMENT OF JUSTICE,**

        Defendant in Intervention.

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ............................................................................................2

   I.  The Oregon Prescription Drug Monitoring Program............................................2

   II. DEA Warrantless Requests to the PDMP............................................................6

   III.     Plaintiffs' Expectation of Privacy in their Prescription Records in the PDMP ..........8

ARGUMENT ...............................................................................................................10

   I.  Summary Judgment Standard ...............................................................................10

   II. The DEA's Warrantless Access to Protected Health Information in the PDMP Violates the Fourth Amendment. ..................................................................................10

      A.   The Fourth Amendment Prohibits Use of Administrative Subpoenas Where a Person Has a Reasonable Expectation of Privacy in the Items or Records Law Enforcement Seeks.           10

      B.   Plaintiffs-Intervenors Have a Reasonable Expectation of Privacy in their Prescription Records Held by the PDMP.           11

         1.   Plaintiffs-Intervenors Have an Actual Expectation of Privacy in their Prescription Records. ................................................................................12

         2.   Society Recognizes the Expectation of Privacy in Prescription Records as Reasonable. ....................................................................................13

           i.   Case law recognizes an expectation of privacy in medical information..............13

           ii.   The confidentiality of patient health information is protected by longstanding ethical rules that were known to the framers of the Fourth Amendment and continue in force today. .............................................................18

           iii.   State laws protect the privacy of patient medical information, including by requiring probable cause for law enforcement access to prescription records. ................................................................................23

           iv.   Prescription records can reveal types of information that are particularly sensitive and receive heightened protections..........................................27

   III.    The State of Oregon's Limited Ability to Access Records in the PDMP Does Not Eliminate Patients' Reasonable Expectation of Privacy in those Records. .........................29

CONCLUSION.............................................................................................................33

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................10

Anderson v. Romero, 72 F.3d 518 (7th Cir. 1995) ...................................................................17

*Arizona v. Gant*, 556 U.S. 332 (2009) ...........................................................................10, 11

*Caesar v. Mountanos*, 542 F.2d 1064 (9th Cir. 1976) ...............................................................17

*Carter v. Commonwealth*, 358 S.W.3d 4 (Ky. Ct. App. 2011)................................................15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................................10

*Commonwealth v. Riedel*, 651 A.2d 135 (Pa. 1994)................................................................25

*DeMassa v. Nunez*, 770 F.2d 1505 (9th Cir. 1985)...............................................19, 26, 32, 33

*Doe v. Attorney Gen. of the U.S.*, 941 F.2d 780 (9th Cir. 1991).........................................16, 27

*Doe v. Blue Cross & Blue Shield*, 794 F. Supp. 72 (D.R.I. 1992) ...........................................27

*Doe v. Broderick*, 225 F.3d 440 (4th Cir. 2000) .........................................................15, 29, 32

Doe v. New York, 15 F.3d 264 (2d Cir. 1994) ...................................................................17, 27

*Doe v. Provident Life & Accident Ins. Co.*, 176 F.R.D. 464 (E.D. Pa. 1997)........................28

Doe v. Se. Pa. Transp. Auth., 72 F.3d 1133 (3d Cir. 1995).....................................................17

*Douglas v. Dobbs*, 419 F.3d 1097 (10th Cir. 2005)...........................................................17, 18

*Elkins v. United States*, 364 U.S. 206 (1960)..........................................................................24

*F.E.R. v. Valdez*, 58 F.3d 1530 (10th Cir. 1995) ....................................................................15

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001) ...........................................13, 14, 18, 22

Harris v. Thigpen, 941 F.2d 1495 (11th Cir. 1991) .................................................................17

Herring v. Keenan, 218 F.3d 1171 (10th Cir. 2000)................................................................17

*In re Application of the U.S. for an Order Directing a Provider of Elec. Commc'ns Serv. to Disclose Records to the Gov't*, 620 F.3d 304 (3d Cir. 2010) ...............................................31

*In re Gimbel*, 77 F.3d 593 (2d Cir. 1996) ...............................................................................11

*Jaffee v. Redmond*, 518 U.S. 1 (1996) ....................................................................................28

*King v. State*, 535 S.E.2d 492 (Ga. 2000)...................................................................21, 25, 32

*Kyllo v. United States*, 533 U.S. 27 (2001) .............................................................................18

*Lee v. City of Columbus, Ohio*, 636 F.3d 245 (6th Cir. 2011) ................................................17

*Minnesota v. Carter*, 525 U.S. 83, 88 (1998) ........................................................................12

*Nat'l Assoc. of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d 665 (S.D.N.Y. 2009) ...........................................................................................................................15

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260 (9th Cir. 1998) .........16, 18, 27

O'Connor v. Ortega, 480 U.S. 709 (1987).............................................................................13

*Seaton v. Mayberg*, 610 F.3d 530 (9th Cir. 2010) ..................................................................16

*See, e.g.*, *State v. Skinner*, 10 So. 3d 1212 (La. 2009) ......................................................14, 25

*Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004) ..................................................27

*Smith v. Maryland*, 442 U.S. 735 (1979) ..................................................................11, 29, 30

*Sorn v. Barnhart*, 178 F. App'x 680 (9th Cir. 2006) .............................................................28

*Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011) ..............................................................18

*State v. Copeland*, 680 S.W.2d 327 (Mo. Ct. App. 1984) ......................................................26

*State v. Nelson*, 941 P.2d 441 (Mont. 1997) ........................................................................25

*State v. Russo*, 790 A.2d 1132 (Conn. 2002) .......................................................................15

*Stone v. Stow*, 593 N.E. 2d 294 (Ohio 1992) ......................................................................15

*Tennessee v. Garner*, 471 U.S. 1 (1985).........................................................................23, 25

*Thurman v. State*, 861 S.W.2d 96 (Tex. App. 1993) .............................................................32

*Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004) ..................................14, 17, 18

*United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108 (9th Cir. 2012) ...............11, 29, 32

United States v. Knoll, 16 F.3d 1313 (2d Cir. 1994) ..............................................................33

*United States v. Miller*, 425 U.S. 435 (1976).................................................................29, 30

*United States v. Plunk*, 153 F.3d 1011 (9th Cir. 1998)...........................................................11

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) ........................................................33

*Virginia v. Moore*, 553 U.S. 164 (2008) ..............................................................................23

Whalen v. Roe, 429 U.S. 589 (1977)..................................................................15, 16, 18, 22

*Williams v. Commonwealth*, 213 S.W. 3d 671 (Ky. 2006).....................................................15

*Yin v. California*, 95 F.3d 864 (9th Cir. 1996)......................................................................17

**Statutes**

2011 Ark. Acts 304 ...........................................................................................................25

2011 Ga. Laws 659, § 2 ...................................................................................25

2011 Md. Laws 166 ........................................................................................25

2011 Mont. Laws ch. 241, § 7 .........................................................................25

2011 Neb. Laws 237 .......................................................................................25

2011 Tenn. Pub. Acts 310, § 3 ........................................................................25

2012 N.H. Adv. Legis. Serv. 196 (LexisNexis) .................................................25

21 U.S.C. § 812(b) ...........................................................................................4

21 U.S.C. § 876(a) ...........................................................................................7

21 U.S.C. § 876(c) ...........................................................................................7

42 U.S.C. § 290dd-2 ......................................................................................29

Ala. Code § 20-2-214(6) .................................................................................24

Alaska Stat. § 17.30.200(d)(5) ........................................................................24

Ark. Code Ann. § 20-7-606(b)(2)(A) ...............................................................24

Ga. Code Ann. § 16-13-60(c)(3) ......................................................................24

Iowa Code § 124.553(1)(c) .............................................................................24

Me. Rev. Stat. tit. 22, § 7250(4) ......................................................................24

Minn. Stat. § 152.126(6)(b)(7) ........................................................................24

Mont. Code Ann. §§ 37-7-1506(1)(e) ..............................................................24

N.H. Rev. Stat. Ann. § 318-B:35(I)(b)(3) ........................................................24

Neb. Rev. Stat. § 71-2455 ..............................................................................24

Or Rev. Stat. § 431.966(2)(a)(C) ......................................................................5

Or. Rev. Stat. § 431.962(1)(a) ..........................................................................2

Or. Rev. Stat. § 431.964(1) .........................................................................3, 31

Or. Rev. Stat. § 431.966(2)(a) ..........................................................................5

Or. Rev. Stat. § 431.966(2)(a)(A) ......................................................................3

Or. Rev. Stat. § 431.966(2)(a)(C) ....................................................................24

Or. Rev. Stat. § 431.966(4) ..............................................................................3

Privacy Protection Act, 42 U.S.C. §§ 2000aa-11(a)(3) .....................................26

Vt. Stat. Ann. tit. 18, § 4284 ..........................................................................24

**Other Authorities**

Lawrence O. Gostin, *Health Information Privacy*, 80 Cornell L. Rev. 451 (1995) ...............21

Mark A. Rothstein, *Chapter 6: Confidentiality*, *in* Medical Ethics: Analysis of the Issues Raised by the Codes, Opinions, and Statements (Baruch A. Brody et al. eds., 2001) ...................19

Office of Diversion Control, Drug Enforcement Administration, Controlled Substance Schedules ........................................................................................................................................3

**Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................10

HIPAA Privacy Rule, 45 C.F.R. § 164.512 ........................................................27

Or. Admin. R. 410-121-4020(24) ........................................................................5

## INTRODUCTION

This case concerns the right to privacy under the Fourth Amendment in some of the most personal and sensitive information people have: prescription records and the confidential medical information they reveal. Prescription records can divulge information not only about the medications a person takes, but also about her underlying medical conditions, the details of her treatment, and her physician's confidential medical advice—all matters that society recognizes as deeply personal and private. Indeed, Oregon law recognizes the need for privacy in this information by specifically requiring that law enforcement obtain a probable cause warrant for such records. Yet, claiming that the State's warrant requirement is preempted by federal law, the federal Drug Enforcement Administration seeks to obtain—and in one case has in fact obtained—Oregon patients' confidential prescription records using administrative subpoenas that do not require a showing of probable cause. Irrespective of whether the State's own warrant requirement is preempted, the DEA's practice violates patients' reasonable expectation of privacy in their prescription records and, therefore, runs afoul of the Fourth Amendment to the U.S. Constitution. A warrant would be required for federal agents to enter the inner sanctum of a person's home and rifle through the contents of her medicine cabinet or bedside drawer; no less protection is required simply because the same information is also stored in a secure database in digital form. As with any other search that infringes on a reasonable expectation of privacy, the DEA must obtain a judicial warrant before perusing a digital archive of patients' confidential health information.

## STATEMENT OF FACTS

I.      The Oregon Prescription Drug Monitoring Program

In 2009, the Oregon legislature created the Oregon Prescription Drug Monitoring

Program ("PDMP"), an electronic database maintained by the Oregon Health Authority ("OHA")

that records information about all "prescription drugs dispensed by pharmacies in Oregon that

are classified in schedules II through IV under the federal Controlled Substances Act." Or. Rev.

Stat. § 431.962(1)(a) (enacted as 2009 Or. Laws, ch. 799, § 2, as amended by 2011 Or. Laws, ch.

720, § 184). The PDMP began collecting information in June 2011 and was fully operational in

September of that year. Oregon Health Auth., Frequently Asked Questions,[1] Decl. of Nathan

Freed Wessler Ex. A; Oregon Health Auth., Oregon Prescription Drug Monitoring Program

("PDMP Fact Sheet") (2012),[2] Wessler Decl. Ex. B.

The Oregon Legislature established the PDMP as a public health tool to allow physicians

"to identify and inhibit the diversion of prescription drugs, while promoting appropriate

utilization of prescription drugs for legitimate medical purposes." S.B. 355, A-Engrossed, 75th

Leg. Assemb. (Or. 2009),[3] Wessler Decl. Ex. C. *See also, e.g.*, Hearing on SB 355 Before the S.

Comm. on Human Servs. & Rural Health Policy, 75th Leg. Assembly, at 00:12:04–00:12:40 (Or.

Feb. 11, 2009) (statement of Sen. Kruse, Co-Sponsor of S.B. 355, Vice-Chair, S. Comm. on

Human Servs. & Rural Health Policy)[4] ("From my perspective the real reason that I have

supported this over the years is because it is going to ensure people get the care they need, and

that is overriding everything else for me is to make sure that people who have chronic pain get

---

[1] http://www.orpdmp.com/faq.html.
[2] http://www.orpdmp.com/orpdmpfiles/PDF_Files/PDMP-fact-sheet_2012_v1.0.pdf.
[3] http://www.leg.state.or.us/09reg/measpdf/sb0300.dir/sb0355.a.pdf.
[4] Audio recording available at http://www.leg.state.or.us/listn/archive/archive.2009s/SHSRHP-200902110759.ram.

the medicine they need. And with this registry that will help. I'm talking about eliminating

errors, eliminating cross medication."); PDMP Fact Sheet, Wessler Decl. Ex. B ("The primary

purpose of the PDMP is to provide practitioners and pharmacists a tool to improve health care.").

Thus, physicians and pharmacists may access patient records in the PDMP only if they "certif[y]

that the requested information is for the purpose of evaluating the need for or providing medical

or pharmaceutical treatment for a patient to whom the practitioner or pharmacist anticipates

providing, is providing or has provided care." Or. Rev. Stat. § 431.966(2)(a)(A).

After dispensing a schedule II–IV prescription drug to a patient in Oregon, pharmacies

are required to electronically report to the PDMP the name, address, and date of birth of the

patient; identification of the pharmacy dispensing the drug and the practitioner who prescribed

the drug; and identification of the drug prescribed, date of origin of the prescription, date the

drug was dispensed, and quantity of the drug dispensed. *Id.* § 431.964(1).[5] Approximately seven

million prescriptions are uploaded to the PDMP system annually, PDMP Fact Sheet, Wessler

Decl. Ex. B, and protected health information about identifiable patients is retained for up to

three years, Or. Rev. Stat. § 431.966(4).

The federal Controlled Substances Act, 21 U.S.C. § 812, creates five categories of drugs,

divided into schedules I–V. Schedule I drugs have "no currently accepted medical use in the

United States, a lack of accepted safety for use under medical supervision, and a high potential

for abuse," and are not available for prescription. Office of Diversion Control, Drug Enforcement

Administration, Controlled Substance Schedules.[6] Drugs are placed in schedules II–V based on

"their relative abuse potential, and likelihood of causing dependence when abused." *Id.*; *see also*

---

[5] New legislation, signed into law by the Oregon Governor on June 28, 2013 but not yet in force,
expands the categories of information reported to the PDMP. S.B. 470, § 3, 77th Leg. Assemb.
(Or. 2013).
[6] http://www.deadiversion.usdoj.gov/schedules/#define.

3 – MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

21 U.S.C. § 812(b) (providing criteria for placing drugs in schedules I–V). Schedule II–IV drugs, which are tracked by the PDMP, include a number of frequently prescribed medications used to treat a wide range of serious medical conditions, including weight loss associated with AIDS, nausea and weight loss in cancer patients undergoing chemotherapy, anxiety disorders, panic disorders, post-traumatic stress disorder, alcohol addiction withdrawal symptoms, heroin addiction, testosterone deficiency, gender identity disorder/gender dysphoria, chronic and acute pain, seizure disorders, narcolepsy, insomnia, and attention deficit hyperactivity disorder. *See* Office of Diversion Control, Drug Enforcement Administration, Controlled Substances by CSA Schedule (May 28, 2013),[7] Wessler Decl. Ex. D;  Decl. of Dr. Deborah C. Peel  ¶¶ 6–7; Wessler Decl. Exs. E–FF (drug information summaries for selected schedule II–IV medications showing medical conditions the drugs are approved to treat). "These conditions are among some of the most frequently diagnosed in Americans," meaning that it is "likely that state PDMPs will soon contain sensitive information about the majority of Americans." Peel Decl. ¶¶ 8–9. Table 1 lists selected schedule II–IV medications used to treat these medical conditions. Attached as Exhibit D to the Wessler Declaration is a list of all schedule I–V drugs.

| TABLE 1[8]

Medical Condition | Medications Approved for Treatment of Condition |
| --- | --- |
| Hormone replacement therapy for treatment of gender identity disorder/gender dysphoria | Testosterone |
| Weight loss associated with AIDS | Marinol (dronabinol), Cesamet (nabilone |
| Nausea & vomiting in cancer patients undergoing chemotherapy | Cesamet (nabilone), Marinol (dronabinol) |
| Trauma- and stressor-related disorders, including acute stress disorder and post-traumatic stress disorder (PTSD) | Xanax, Valium, Ativan, Lexotan, Librium, Traxene, Sepazon, Serax, Centrax, nordiazepam |

[7] http://www.deadiversion.usdoj.gov/schedules/orangebook/e_cs_sched.pdf.
[8] Peel Decl. ¶ 7; Wessler Decl. Exs. E–FF.

| Anxiety disorders and other disorders with symptoms of panic | Xanax, Valium, Ativan, Lexotan, Librium, Traxene, Sepazon, Serax, Centrax, nordiazepam |
| --- | --- |
| Alcohol addiction withdrawal symptoms | Serax/Serenid-D, Librium (chlordiazepoxide) |
| Heroin addiction treatment | methadone |
| Attention deficit hyperactivity disorder | Ritalin, Adderol, Vyvanse |
| Obesity (weight loss drugs) | Didrex, Voranil, Tenuate, mazindol |
| Chronic or acute pain | narcotic painkillers, such as codeine (including Tylenol with codeine), hydrocodone, Demerol, morphine, Vicodin, oxycodone (including Oxycontin and Percocet) |
| Epilepsy and seizure disorders | Nembutal (pentobarbital), Seconal (secobarbital), clobazam, clonazepam, Versed |
| Testosterone deficiency in men | ethylestrenol (Maxibolin, Orabolin, Durabolin, Duraboral) |
| Delayed puberty in boys | Anadroid-F, Halotestin, Ora-Testryl |
| Narcolepsy | Xyrem, Provigil |
| Insomnia | Ambien, Lunesta, Sonata, Restoril, Halcion, Doral, Ativan, ProSom, Versed |
| Migraines | butorphanol (Stadol) |

Because many of these drugs are approved only for treatment of specific medical conditions, a prescription for a schedule II–IV drug will often reveal a patient's underlying medical condition. Peel Decl. ¶ 3; Decl. of Professor Mark A. Rothstein ¶ 10; Wessler Decl. Exs. E–FF. Thus, information about an individual's prescriptions in the PDMP can reveal a great deal of sensitive medical information. In recognition of Oregon residents' privacy interest in their prescription records, the legislation creating the PDMP included privacy protections that sharply limit access to personally identifiable prescription information in the database. *See* Or. Rev. Stat. § 431.966(2)(a). Relevant here, the PDMP is prohibited from disclosing prescription records to law enforcement agencies unless presented with a "valid court order based on probable cause and issued at the request of a federal, state or local law enforcement agency engaged in an authorized drug-related investigation involving a person to whom the requested information pertains." *Id.* § 431.966(2)(a)(C); *see also* Or. Admin. R. 410-121-4020(24) ("The [law enforcement] request

5 – MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

shall be pursuant to a valid court order based on probable cause."). The Oregon Health

Authority, the state agency that administers the PDMP, prominently and repeatedly explains this

protection on the Oregon PDMP website. *See* Oregon Health Authority, Data Requests,[9] Wessler

Decl. Ex. GG ("[Law enforcement may] gather information for an active drug-related

investigation of an individual when permitted by a valid court order based on probable cause.");

Oregon Health Authority, Law Enforcement,[10] Wessler Decl. Ex. HH ("A subpoena is not

sufficient for the PDMP to release information. A law enforcement agency must provide a search

warrant signed by a judge or a court order signed by a judge that indicates there is probable cause

for the judge to issue the order."); Oregon Health Authority, Frequently Asked Questions,[11]

Wessler Decl. Ex A ("Law enforcement agencies will not have direct access to the system, but

law enforcement officials may request information from the Oregon Health Authority if they

have a valid court order based on probable cause for an authorized drug-related investigation of

an individual.").

II.    DEA Warrantless Requests to the PDMP

    Notwithstanding the requirement of a court order based on probable cause under Oregon

law, the Drug Enforcement Administration ("DEA") has been attempting to obtain protected

health information from the PDMP using administrative subpoenas pursuant to 21 U.S.C. § 876.

*E.g.*, Petition to Enforce DEA Administrative Subpoena, *United States v. State of Oregon

Prescription Drug Monitoring Program* (hereinafter "*U.S. v. Oregon PDMP*"), No. 12-MC-298

(D. Or. Aug. 24, 2012), Wessler Decl. Ex. II; *see also* Decl. of Nina Englander in Support of

Motion for Summary Judgment ¶¶ 2–7, ECF No. 26. Section 876 permits certain federal law

---

[9] http://www.orpdmp.com/data-requests/.
[10] http://www.orpdmp.com/law-enforcement/.
[11] http://www.orpdmp.com/faq.html.

enforcement officials to issue and serve subpoenas seeking records "relevant or material" to a controlled substances investigation. 21 U.S.C. § 876(a). The subpoenas are issued without first being presented to a court, but are judicially enforceable if the recipient declines to honor them. *Id.* § 876(c). The DEA has issued multiple § 876 subpoenas to the PDMP, and has stated that it will issue approximately two subpoenas to the PDMP per month for the foreseeable future. Declaration of Lori A. Cassity In Support of Petition to Enforce DEA Administrative Subpoena ¶ 6, *U.S. v. Oregon PDMP*, No. 12-MC-298 (D. Or. Aug. 24, 2012), Wessler Decl. Ex. JJ; Englander Decl. ¶¶ 2, 4–5.

The State of Oregon has refused to comply with the DEA subpoenas on the basis that complying with them would violate Oregon law. *See* Englander Decl. ¶¶ 6–7 & Exs. E–F. The DEA takes the position that the Oregon requirement of a court order based on probable cause is preempted by § 876. Memorandum in Support of Petition to Enforce DEA Administrative Subpoena, *U.S. v. Oregon PDMP*, No. 12-MC-298 (D. Or. Aug. 24, 2012), Wessler Decl. Ex. KK. The DEA has obtained judicial enforcement of at least one subpoena. That subpoena, issued on January 5, 2012, sought production of "a Physician Profile for all Schedule II-V controlled substance prescriptions written by [a specific doctor, whose name is redacted from public filings] from 6/01/2011 through 1/06/2012." *Id.* at 2. In its petition to enforce the subpoena, the DEA specifically stated that redacted protected health information could not reasonably be used in the investigation, and therefore that it was seeking the names and other identifying information of individual patients who filled prescriptions written by the doctor under investigation. Declaration of Tyler D. Warner in Support of Petition to Enforce DEA Administrative Subpoena ¶ 6, *U.S. v. Oregon PDMP*, No. 12-MC-298 (D. Or. Aug. 24, 2012), Wessler Decl. Ex. LL. On August 27, 2012, a magistrate judge in the District of Oregon granted the DEA's petition to enforce the

subpoena and found the state requirement of a court order based on probable cause to be

preempted. Order to Enforce DEA Administrative Subpoena, *U.S. v. Oregon PDMP*, 12-MC-298

(D. Or. Aug. 27, 2012), Wessler Decl. Ex. MM. The PDMP complied with the magistrate

judge's order and disclosed the protected prescription information requested by the subpoena to

the DEA. Englander Decl. ¶ 3.

      After the August 2012 magistrate judge's order, the State of Oregon maintained its

position that state law precluded it from complying with DEA subpoenas for protected health

information in the PDMP. Englander Decl. ¶¶ 6–7. After receiving at least two more § 876

subpoenas, the State of Oregon filed suit in this Court seeking a declaration that Oregon's

restrictions on law enforcement access are not preempted and that the state "cannot be compelled

to disclose an individual's protected health information to the DEA pursuant to an administrative

subpoena unless so ordered by a federal court." Compl. at 4, ECF No. 1. Plaintiffs-Intervenors

John Does 1–4, Dr. James Roe, and the ACLU of Oregon sought and this Court granted

intervention in order to raise claims under the Fourth Amendment. Order, ECF No. 17.

III.    Plaintiffs' Expectation of Privacy in their Prescription Records in the PDMP

      The information contained in the PDMP and sought by the DEA implicates the privacy

rights of Oregon residents and physicians practicing in Oregon, including Plaintiffs-Intervenors.

If the DEA were to obtain further prescription records from the PDMP without obtaining a

warrant based on probable cause, it would be able to learn what schedule II–IV medications

individuals are taking and, by extension, the nature of their underlying medical conditions. Peel

Decl. ¶ 3. This would violate the reasonable expectation of privacy that doctors and patients have

in their protected health information. *See generally* Rothstein Decl.

Plaintiffs-Intervenors all receive or issue prescriptions for schedule II, III, or IV drugs that are filled in Oregon pharmacies and therefore are recorded in the PDMP.[12] Decl. of John Doe 1 ¶¶ 4–6; Decl. of John Doe 2 ¶¶ 4–5; Decl. of John Doe 3 ¶¶ 4–5; Decl. of John Doe 4 ¶¶ 4–5; Decl. of Dr. James Roe ¶¶ 8–16. John Doe 4 is a medical student in the Portland area and a resident of Oregon. Doe 4 Decl. ¶ 3. He identifies as transgender and, after being diagnosed with gender identity disorder more than three years ago, he began hormone replacement therapy. *Id.* ¶¶ 6–9. This involves self-administering injections of prescription testosterone, a schedule III drug, once every two weeks. *Id.* ¶ 11. John Doe 2, an attorney, has also been diagnosed with gender identity disorder and is undergoing hormone replacement therapy consisting of injections of prescription testosterone as part of his transition from female to male gender identity. Doe 2 Decl. ¶¶ 3–11.

John Doe 3, a small business owner, takes alprazolam (Xanax), a schedule IV drug, to treat anxiety and post-traumatic stress disorders. Doe 3 Decl. ¶¶ 3, 14–17. John Doe 3 also suffers from a genetic blood disorder that prevents him from taking over-the-counter pain medications. As a result, he takes Vicodin, a schedule III drug, to relieve the types of pain that most people are able to treat with over-the-counter medications. *Id.* ¶¶ 6–13.

John Doe 1, a retired CEO, currently takes two medications classified in schedule II under the federal Controlled Substances Act to treat the extreme pain caused by recurring kidney stones. Doe 1 Decl. ¶¶ 3, 7–13. Until recently, he also took two medications classified in schedule IV to treat persistent insomnia caused by restless leg syndrome. *Id.* ¶¶ 14–22. These individuals consider information about their prescriptions and the health conditions they treat to be private, and they are distressed by the prospect of the DEA's gaining access to them without a

---

[12] Plaintiff-Intervenor ACLU of Oregon sues on behalf of its members who have prescription records in the PDMP.

9 – MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

warrant. Doe 1 Decl. ¶¶ 24–28; Doe 2 Decl. ¶¶ 18–21; Doe 3 Decl. ¶¶ 18–27; Doe 4 Decl. ¶¶ 12–19.

James Roe, M.D., is an internist who primarily treats geriatric and hospice patients. Roe Decl. ¶¶ 3, 7. Because of the nature of his practice, he prescribes more schedule II–IV drugs, particularly opiate and narcotic pain medications, than physicians in other specialties. *Id.* ¶¶ 13–15. Dr. Roe has been interviewed and investigated by the DEA, and believes that the DEA has sought his prescription records from the PDMP. *Id.* ¶¶ 25–34, 38–39. He is distressed that the DEA may have requested information about his prescription records and his patients' protected health information without a warrant. *Id.* ¶ 33–35, 43.

## ARGUMENT

### I.    Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

### II.   The DEA's Warrantless Access to Protected Health Information in the PDMP Violates the Fourth Amendment.

#### A.    The Fourth Amendment Prohibits Use of Administrative Subpoenas Where a Person Has a Reasonable Expectation of Privacy in the Items or Records Law Enforcement Seeks.

Where an individual has a reasonable expectation of privacy in an item or location to be searched, the search is "'*per se* unreasonable under the Fourth Amendment'" unless conducted pursuant to a judicial warrant. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States,* 389 U.S. 347, 357 (1967)). Only if there is no reasonable expectation of privacy, or if one of the "few specifically established and well-delineated exceptions" to the warrant requirement

applies, may government officials conduct a warrantless search. *Id.* (internal quotation marks

omitted). Accordingly, the government may use an administrative subpoena to conduct a search

only if the target of the search lacks a reasonable expectation of privacy in the requested records.

*United States v. Plunk*, 153 F.3d 1011, 1020 (9th Cir. 1998) ("Plunk does not have the requisite

standing to challenge [the subpoena's] issuance under the Fourth Amendment 'unless he [can]

demonstrate that he had a legitimate expectation of privacy attaching to the records obtained.'"

(second alteration in original)), *amended by* 161 F.3d 1195 (9th Cir. 1998), *abrogated on other*

*grounds by United States v. Hankey*, 203 F.3d 1160, 1169 & n.7 (9th Cir. 2000); *see also, e.g.*, *In*

*re Gimbel*, 77 F.3d 593, 599 (2d Cir. 1996) (stating that the Fourth Amendment bars use of an

administrative subpoena when "a subpoena respondent maintains a reasonable expectation of

privacy in the materials sought by the subpoena"). The Ninth Circuit has therefore permitted use

of administrative subpoenas only after determining that the target of the investigation lacked a

reasonable expectation of privacy in the items or records law enforcement seeks. *E.g.*, *United*

*States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1116 (9th Cir. 2012); *Plunk*, 153 F.3d at

1020.

    B.  Plaintiffs-Intervenors Have a Reasonable Expectation of Privacy in their Prescription
        Records Held by the PDMP.

To establish a reasonable expectation of privacy under the Fourth Amendment, a litigant

must demonstrate an actual expectation of privacy in the item or location searched, and that the

expectation of privacy is "one that society is prepared to recognize as reasonable." *Smith v.*

*Maryland*, 442 U.S. 735, 740 (1979) (internal quotation marks omitted). A reasonable

expectation of privacy is "one that has 'a source outside of the Fourth Amendment, either by

reference to concepts of real or personal property law or to understandings that are recognized

and permitted by society.'" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143–44 & n.12 (1978)).

> 1.  Plaintiffs-Intervenors Have an Actual Expectation of Privacy in their Prescription Records.

Plaintiffs-Intervenors have an actual, personal expectation of privacy in their prescription records held by the PDMP and the medical information those records reveal. John Does 1–4's prescription records reveal sensitive and private information about the medical conditions their prescriptions treat, which include gender identity disorder or gender dysphoria, anxiety and post-traumatic stress disorders, frequent kidney stones, persistent insomnia, and recurring pain. Doe 1 Decl. ¶¶ 7–8, 14; Doe 2 Decl. ¶¶ 6–9; Doe 3 Decl. ¶¶ 8–9, 14–15; Doe 4 Decl. ¶¶ 6–8. Their prescription records also reveal details about their medical treatment itself and the treatment decisions made in conjunction with their physicians, including potentially embarrassing or stigmatizing details of their diagnoses, drug dosages, and the nature and stage of their treatment. For example, John Doe 2 regularly fills prescriptions for testosterone, which he self-administers in weekly injections to facilitate his transition from female to male sex. Doe 2 Decl. ¶¶ 8–11. Not only does his prescription information reveal his diagnosis of gender identity disorder and his transgender identity, but information about his dosage also can reveal the status and stage of his transition; a future decrease in his testosterone dosage could indicate that he has had his uterus and ovaries removed, a fact that he considers deeply private. *Id.* ¶¶ 13–16, 20. Dr. James Roe's prescription records are also private, as they reveal confidential information about his treatment of patients and the doctor-patient relationship. Roe Decl. ¶¶ 14–15, 28, 43. Each Plaintiff-Intervenor has an actual expectation of privacy in these records, as explained in their declarations. Doe 1 Decl. ¶¶ 24–28; Doe 2 Decl. ¶¶ 18–21; Doe 3 Decl. ¶¶ 18–27; Doe 4 Decl.

¶¶ 12–19; Roe Decl. ¶ 43; *see also* Peel Decl. ¶ 16 ("[I]nformation about Plaintiffs-Intervenors'
prescriptions reveals sensitive details of their diagnoses.").

> 2.  Society Recognizes the Expectation of Privacy in Prescription Records as
>     Reasonable.

Prescription records reveal intimate, private, and potentially stigmatizing details about a
patient's health, including the patient's underlying medical condition, the severity of the
condition, and the course of treatment prescribed by the treating physician. Peel Decl. ¶¶ 3, 17.
For that reason, as with other medical records, they are widely considered private—and
reasonably so.

Under the Fourth Amendment, there is "no talisman that determines in all cases those
privacy expectations that society is prepared to accept as reasonable." *O'Connor v. Ortega,* 480
U.S. 709, 715 (1987) (plurality opinion). "Instead, 'the Court has given weight to such factors as
the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a
location, and our societal understanding that certain areas deserve the most scrupulous protection
from government invasion.'" *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 178 (1984)).
Warrantless access to confidential medical records trenches on privacy expectations recognized
by case law, states' practices, and longstanding principles of medical ethics known to the Fourth
Amendment's framers and relied on by the public today. Therefore, the DEA's use of
administrative subpoenas to obtain records in the PDMP violates the Fourth Amendment.

> i.  Case law recognizes an expectation of privacy in medical information.

In *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), the Supreme Court held that
patients have a reasonable expectation of privacy in their medical records. The case addressed
whether the "special needs" exception to the Fourth Amendment provides a state hospital with
"authority to conduct drug tests [of patients] and to turn the results over to law enforcement

agents without the knowledge or consent of the patients." *Id.* at 77. Before concluding that the special needs exception did not apply—and thus that the hospital had violated the Fourth Amendment—the Court held that "[t]he reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent." *Id.* at 78. The Court apparently found that principle an easy one, remarking that "in none of our prior cases was there any intrusion upon that kind of expectation" and that "we have previously recognized that an intrusion on that expectation may have adverse consequences because it may deter patients from receiving needed medical care." *Id.* at 78 & n.14. Although the Court has not addressed the privacy interest under the Fourth Amendment in prescription records in particular, its reasoning in *Ferguson* applies with equal force to medical records beyond diagnostic test results, including confidential prescription information that can reveal just as much about an underlying diagnosis as can the test results themselves.

The Ninth Circuit, too, has recognized that patients and doctors have a reasonable expectation of privacy in medical records under the Fourth Amendment. Thus, in *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 550 (9th Cir. 2004), the court held that a warrant is required for law enforcement to search medical records held by an abortion clinic, in part because "all provision of medical services in private physicians' offices carries with it a  high expectation of privacy for both physician and patient." Other courts have echoed this conclusion. *See, e.g.*, *State v. Skinner*, 10 So. 3d 1212, 1218 (La. 2009) ("[W]e find that the right to privacy in one's medical and prescription records is an expectation of privacy that society is prepared to recognize as reasonable. Therefore, absent the narrowly drawn exceptions permitting warrantless searches, we hold a warrant is required to conduct an investigatory search of medical and/or

prescription records."); *Doe v. Broderick*, 225 F.3d 440, 450–51 (4th Cir. 2000) ("[A] patient's expectation of privacy . . . in his treatment records and files maintained by a substance abuse treatment center is one that society is willing to recognize as objectively reasonable."); *Nat'l Assoc. of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d 665, 674–75 (S.D.N.Y. 2009) (holding that postal employees whose medical information was obtained from health care providers by the Postal Service without consent "have—at a minimum—standing to bring suit based on a reasonable expectation of privacy in their medical records"); *see also F.E.R. v. Valdez*, 58 F.3d 1530, 1535 (10th Cir. 1995) (noting that the patient-plaintiffs "had an expectation of privacy in their medical records" and upholding search pursuant to a facially valid warrant).[13]

One source of the expectation of privacy in medical information and prescription records can be found in cases addressing the right to informational privacy under the Due Process clauses of the Fifth and Fourteenth Amendments. Those cases—more numerous than the cases addressing medical records under the Fourth Amendment—speak to the widespread acceptance, and thus the reasonableness, of privacy protections for medical records. The foundational case is *Whalen v. Roe,* 429 U.S. 589 (1977). There the Supreme Court considered whether New York's collection of prescription records in an early computerized database violated patients' and

---

[13] Some courts have held that there is no reasonable expectation of privacy in prescription records under the Fourth Amendment, relying on the "third party doctrine." *See Williams v. Commonwealth*, 213 S.W. 3d 671, 682–84 (Ky. 2006). That reasoning has come under significant criticism, and is inapt here. *See, e.g.*, *Carter v. Commonwealth*, 358 S.W.3d 4, 8–9 (Ky. Ct. App. 2011) (explaining strong disagreement with reasoning of *Williams* and imposing reasonable suspicion standard for requests for prescription records); *see also infra* Part III (explaining why third party doctrine does not apply in this case). Courts have also applied the "pervasively regulated industry" exception to the Fourth Amendment in permitting inspections of pharmacy records. *See, e.g.*, *State v. Russo*, 790 A.2d 1132, 1151–52 (Conn. 2002); *Stone v. Stow*, 593 N.E. 2d 294, 300–01 (Ohio 1992). Those cases are inapposite because they authorize inspections of individual pharmacies, not searches of all of a patient's or physician's prescription records in a comprehensive statewide electronic database maintained by a state agency.

doctors' right to informational privacy. Although the Court held that the security and privacy

protections of New York's system made it constitutionally permissible, it recognized a right to

informational privacy and explained that the right "involved at least two different kinds of

interests. One is the individual interest in avoiding disclosure of personal matters, and another is

the interest in independence in making certain kinds of important decisions." *Id.* at 599–600. The

Court explained how collection of prescription records implicates both factors:

> The mere existence in readily available form of the information about patients'
> use of Schedule II drugs creates a genuine concern that the information will
> become publicly known and that it will adversely affect their reputations. This
> concern makes some patients reluctant to use, and some doctors reluctant to
> prescribe, such drugs even when their use is medically indicated. It follows,
> [plaintiffs] argue, that the making of decisions about matters vital to the care of
> their health is inevitably affected by the statute. Thus, the statute threatens to
> impair both their interest in the nondisclosure of private information and also their
> interest in making important decisions independently.

*Id.* at 600.[14]

The Ninth Circuit has significantly expanded on the Supreme Court's discussion in

*Whalen*, firmly and repeatedly recognizing the "privacy protection afforded medical

information." *Doe v. Attorney Gen. of the U.S.*, 941 F.2d 780, 795–96 (9th Cir. 1991), *vacated on

other grounds sub nom. Reno v. Doe ex rel. Lavery*, 518 U.S. 1014 (1996). The court has

explained that "[o]ne can think of few subject areas more personal and more likely to implicate

privacy interests than that of one's health," and has stated that collection of medical information

"implicate[s] rights protected under both the Fourth Amendment and the Due Process Clause[s]."

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998); *see also

Seaton v. Mayberg*, 610 F.3d 530, 541 (9th Cir. 2010) ("One who goes to a physician in order to

---

[14] In *Whalen*, the Court expressly declined to address application of the Fourth Amendment to
searches of medical records because the facts of the case did not involve any of the "affirmative,
unannounced, narrowly focused intrusions into individual privacy during the course of criminal
investigations" at issue in prior Fourth Amendment cases. *Id.* at 604 n.32.

16 – MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

obtain medical benefit to himself or his family has substantial privacy interests . . . ."); *Tucson Woman's Clinic*, 379 F.3d at 551 ("Individuals have a constitutionally protected interest in avoiding 'disclosure of personal matters,' including medical information."); *Yin v. California*, 95 F.3d 864, 870 (9th Cir. 1996) ("[I]ndividuals have a right protected under the Due Process Clause of the Fifth or Fourteenth Amendments in the privacy of personal medical information and records."); *Caesar v. Mountanos*, 542 F.2d 1064, 1067 n.9 (9th Cir. 1976) (recognizing "the right of privacy encompassing the doctor-patient relationship"). Other circuits to address the issue agree. *Herring v. Keenan*, 218 F.3d 1171, 1175 (10th Cir. 2000); *Doe v. Se. Pa. Transp. Auth.*, 72 F.3d 1133, 1137 (3d Cir. 1995); *Anderson v. Romero*, 72 F.3d 518, 522 (7th Cir. 1995); *Doe v. New York*, 15 F.3d 264, 267 (2d Cir. 1994); *see also Harris v. Thigpen*, 941 F.2d 1495, 1513 (11th Cir. 1991) (assuming such right exists). *Cf. Lee v. City of Columbus, Ohio*, 636 F.3d 245, 260–61 (6th Cir. 2011) (recognizing privacy interest in medical records but stating that "'a person possesses no reasonable expectation that his medical history will remain *completely* confidential'").

Further, two circuits have specifically held that the right to privacy in medical information encompasses prescription records. As the Third Circuit explained,

> It is now possible from looking at an individual's prescription records to determine that person's illnesses, or even to ascertain such private facts as whether a woman is attempting to conceive a child through the use of fertility drugs. This information is precisely the sort intended to be protected by penumbras of privacy. An individual using prescription drugs has a right to expect that such information will customarily remain private.

*Se. Pa. Transp. Auth.*, 72 F.3d at 1138 (citation omitted); *accord Douglas v. Dobbs*, 419 F.3d 1097, 1102 (10th Cir. 2005) ("[W]e have no difficulty concluding that protection of a right to privacy in a person's prescription drug records, which contain intimate facts of a personal nature, is sufficiently similar to other areas already protected within the ambit of privacy. Information

contained in prescription records . . . may reveal other facts about what illnesses a person has . . . .").

Courts have also recognized that physicians, in addition to patients, have an interest in the privacy of their prescription and other medical records. The Supreme Court recently noted: "It may be assumed that, for many reasons, physicians have an interest in keeping their prescription decisions confidential." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2668 (2011); *see also Whalen*, 429 U.S. at 600 (explaining concern that risk of privacy violations make "some doctors reluctant to prescribe . . . drugs even when their use is medically indicated").

These cases protecting the privacy of medical information under the Fifth and Fourteenth Amendments provide a source for the societal expectation of privacy in prescription records and the medical information they reveal, and thus a basis for triggering the Fourth Amendment's protections. *See Douglas*, 419 F.3d at 1101–03 (relying on *Whalen* and related cases to inform analysis of Fourth Amendment interest in privacy of prescription records). Because "few subject areas [are] more personal and more likely to implicate privacy interests than that of one's health," *Norman-Bloodsaw*, 135 F.3d at 1269, patients have a reasonable expectation of privacy in their medical information.[15] The Supreme Court and Ninth Circuit have recognized as much. *Ferguson*, 532 U.S. at 78; *Tucson Woman's Clinic*, 379 F.3d at 550.

    ii.    The confidentiality of patient health information is protected by longstanding ethical rules that were known to the framers of the Fourth Amendment and continue in force today.

---

[15] Prescription records reveal some medical information (the drugs and dosages a person takes) directly and other information (a patient's underlying medical conditions) by inference. A search can implicate the Fourth Amendment regardless of whether it reveals information directly or through inference. *See Kyllo v. United States*, 533 U.S. 27, 36 (2001) (rejecting "the novel proposition that inference insulates a search," noting that it was "blatantly contrary" to the Court's holding in *United States v. Karo*, 468 U.S. 705 (1984), "where the police 'inferred' from the activation of a beeper that a certain can of ether was in the home").

18 – MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The confidentiality of patient medical information has been "a cornerstone of medical practice throughout much of the world" for millennia and is protected today by codes of ethics of medical professional societies. Rothstein Decl. ¶ 3. This constitutes an important source of patients' reasonable expectation of privacy in their medical information. *See DeMassa v. Nunez*, 770 F.2d 1505, 1506–07 (9th Cir. 1985) (per curiam) (identifying rules of professional conduct and other sources of professional ethics as source of clients' reasonable expectation of privacy in client files possessed by attorneys).

The Oath of Hippocrates, originating in the fourth century B.C.E., required physicians to maintain patient secrets. Mark A. Rothstein, *Chapter 6: Confidentiality*, *in* Medical Ethics: Analysis of the Issues Raised by the Codes, Opinions, and Statements 161, 170 (Baruch A. Brody et al. eds., 2001). In American medical practice, provisions on preserving the confidentiality of patient health information were included in the earliest codes of ethics of American medical societies in the 1820s and 1830s, the first Code of Medical Ethics of the American Medical Association in 1847, every subsequent edition of that code, and in the ethical codes of other health professionals, including the American Nurses Association and American Pharmaceutical Association. Decl. of Professor Robert Baker ¶¶ 12–15; Rothstein Decl. ¶ 3; *see also* Rothstein, *Confidentiality*, at 172–73 (providing excerpts from modern codes). Today, virtually all patients (97.2%) believe that health care providers have a "legal and ethical responsibility to protect patients' medical records." New London Consulting & FairWarning, How Privacy Considerations Drive Patient Decisions and Impact Patient Care Outcomes 10 (Sept. 13, 2011),[16] Wessler Decl. Ex. NN.

---

[16] *Available at* http://www.fairwarning.com/whitepapers/2011-09-WP-US-PATIENT-SURVEY.pdf.

Medical confidentiality was an established norm in colonial and founding-era America, and the framers of the Fourth Amendment were well aware of the need for maintaining the confidentiality of patients' medical information. In the eighteenth century, almost every American "regular physician" studied at the University of Edinburgh Medical School in Scotland or under someone who had trained there. Baker Decl. ¶¶ 4–5. Beginning in the 1730s, every physician who received a medical degree from the University of Edinburgh was required to sign an oath swearing "never, without great cause, to divulge anything that ought to be concealed, which may be heard or seen during professional attendance." *Id.* ¶ 6 & n.1. Physicians who had been educated at the University of Edinburgh or under one of its graduates, and thus who had sworn to keep patients' medical information confidential, were among the signers of the Declaration of Independence and delegates to the Constitutional Convention. *Id.* ¶ 7. Most notably, Benjamin Rush, one of the signers of the Declaration of Independence, was a physician and an alumnus of the University of Edinburgh, the author of a published lecture on medical confidentiality, and perhaps the most influential medical educator in founding-era America. *Id.* ¶¶ 8–9. Three other physicians were among the signers of the Declaration of Independence, and at least three physicians were delegates to the Constitutional Convention. *Id.* ¶¶ 7, 10. Of the latter, one (James McClurg) received his medical degree from the University of Edinburgh and another (James McHenry) received his medical education studying under Dr. Rush. *Id.* ¶ 10. "These men would have been well acquainted with the traditional ethical precept of keeping patients' medical information confidential." *Id.*

Further, patients treated by "regular physicians" trained in the Edinburgh tradition would also have understood the guarantee of confidentiality of the medical information they shared with their physicians, including the prescribing orders written to obtain medicine from an

apothecary or compounding pharmacist. *Id.* ¶ 18. Like George Washington, who was treated by Edinburgh-educated physician Samuel Bard, most of the delegates to the Constitutional Convention would have had access to the services of such physicians, who practiced in significant numbers in the population centers of the late-18th century United States. *Id.* ¶ 5. The delegates thus would have expected their own medical information to have been protected against release to third parties without their consent. *Id.* ¶¶ 5, 18. Thus, ethical protections of the confidentiality of medical information were firmly in place at the time of the Fourth Amendment's ratification in 1791 and were known to the Constitution's framers.

The strong and enduring guarantees of the confidentiality of patients' medical information are "essential in encouraging patients to provide their physicians with accurate and complete health information, without which medical care would be severely compromised." Rothstein Decl. ¶ 4. Without confidentiality protections, patients would "delay medical care or avoid treatment altogether" and suffer embarrassment, stigma, and economic harms. *Id.* ¶¶ 5–6. A lack of confidentiality protections can also lead to public health consequences and "can lessen societal support for the health care system." *Id.* ¶¶ 7–8; *see also* Lawrence O. Gostin, *Health Information Privacy*, 80 Cornell L. Rev. 451, 490–91 (1995) (explaining why protecting the confidentiality of patients' medical information "is valued not only to protect patients' social and economic interests, but also their health and the health of the wider community").

The consequences of law enforcement gaining easy access to medical records are particularly harmful. As one court has explained, "[p]ermitting the State unlimited access to medical records for the purposes of prosecuting the patient would have the highly oppressive effect of chilling the decision of any and all [persons] to seek medical treatment." *King v. State*, 535 S.E.2d 492, 496 (Ga. 2000). The Supreme Court has echoed this concern, recognizing that

violating a patient's expectation in the confidentiality of medical information "may have adverse consequences because it may deter patients from receiving needed medical care." *Ferguson*, 532 U.S. at 78 n.14 (citing *Whalen*, 429 U.S. at 599–600); *accord Whalen*, 429 U.S. at 602 ("Unquestionably, some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention."). This principle is longstanding: the first American medical society to formalize its code of medical ethics, the Medical Society of the State of New York, instructed physicians as early as 1823 that they were not to break patient confidences even when haled into court. Baker Decl. ¶¶ 12–13.

Unjustified law enforcement access to confidential medical information can deter physicians from prescribing and patients from receiving medications, including pain control drugs that are medically necessary, "resulting in more under-treatment of chronic pain." Rothstein Decl. ¶ 9–11; *see also* Peel Decl. ¶¶ 18–19, 23–24. Accordingly, 93% of patients want to decide which government agencies can access their electronic health records,[17] and 88% oppose letting police see their medical records without permission.[18] The Oregon Legislature's inclusion of the probable cause requirement reflects its considered understanding that unjustified law enforcement access to prescription records violates patients' expectations of privacy and would cause harm. *See, e.g.*, Work Session on SB 355 Before the S. Comm. on Human Servs. & Rural Health Policy, 75th Leg. Assembly, at 0:7:23–0:7:35 (Or. Apr. 13, 2009) (statement of

---

[17] Patient Privacy Rights & Zogby International, *2000 Adults' Views on Privacy, Access to Health Information, and Health Information Technology* 4 (2010), http://patientprivacyrights.org/wp-content/uploads/2010/11/Zogby-Result-Illustrations.pdf, Wessler Decl. Ex. OO.

[18] Institute for Health Freedom & Gallup Organization, *Public Attitudes Toward Medical Privacy* 9–10 (Sept. 26, 2000), http://www.forhealthfreedom.org/Gallupsurvey/IHF-Gallup.pdf, Wessler Decl. Ex. PP.

Sen. Bates)[19] ("If you look at the bill carefully you'll see we did everything to protect people.

Law enforcement cannot get into this database without a court order that's based on probable

cause."); Senate floor debate on SB 355, 75th Leg. Assembly, at 0:45:05–0:45:26 (Or. June 25,

2009) (statement of Sen. Kruse)[20] ("We do not even have law enforcement involved. For law

enforcement to get this information it would have to be in relation to an ongoing case, and they

would need probable cause, which is an incredibly high bar."); House floor debate on SB 355,

75th Leg. Assembly, at 0:39:42–0:39:51 (Or. June 25 2009) (statement of Rep. Shields)[21] ("This

bill is not going to get in the way of the Fourth Amendment. If law enforcement wants these

records, they're going to have to get a warrant in order to do so . . . .").

        iii.    State laws protect the privacy of patient medical information,
               including by requiring probable cause for law enforcement access to
               prescription records.

"In evaluating the reasonableness of police procedures under the Fourth Amendment,"

the Supreme Court has often "looked to prevailing rules in individual jurisdictions." *Tennessee v.*

*Garner*, 471 U.S. 1, 15–16 (1985) (citing *United States v. Watson*, 423 U.S. 411, 421–22

(1976)).[22] Thus, for example, as support for its holding that the Fourth Amendment prohibits the

use of lethal force to apprehend a fleeing felon absent a significant threat of death or serious

bodily injury to the officer or others, the Court noted in *Garner* that the trend in state laws was

away from the common law rule allowing deadly force against any fleeing felon. *Id.* at 18 &

---

[19] Audio recording available at http://www.leg.state.or.us/listn/archive/archive.2009s/SHSRHP-200904130806.ram.

[20] Audio recording available at http://www.leg.state.or.us/listn/archive/archive.2009s/SENATE-200906251614.ram.

[21] Audio recording available at http://www.leg.state.or.us/listn/archive/archive.2009s/HOUSE-200906291645.ram.

[22] Fourth Amendment rules are not determined by state law, *Virginia v. Moore*, 553 U.S. 164 (2008), but *Garner* illustrates how the Court's assessment of Fourth Amendment standards can be informed by relevant state practices.

n.21; *see also Elkins v. United States*, 364 U.S. 206, 219 (1960) (looking to states' practices in determining scope of Fourth Amendment's exclusionary rule). Here, likewise, the majority of states protect the confidentiality of medical information, and a significant number of states specifically require a warrant or probable cause to access records in a state prescription monitoring program.

Including Oregon, nine states have enacted legislation prohibiting law enforcement from accessing records in those states' prescription monitoring programs unless the government gets a warrant or otherwise demonstrates probable cause. Ala. Code § 20-2-214(6), as amended by 2013 Ala. Laws Act 2013-256 (H.B. 150) ("declaration that probable cause exists"); Alaska Stat. § 17.30.200(d)(5) ("search warrant, subpoena, or order issued by a court establishing probable cause"); Ark. Code Ann. § 20-7-606(b)(2)(A) ("search warrant signed by a judge that demonstrates probable cause"); Ga. Code Ann. § 16-13-60(c)(3) ("search warrant"); Iowa Code § 124.553(1)(c) ("order, subpoena, or other means of legal compulsion . . . that is issued based upon a determination of probable cause"); Minn. Stat. § 152.126(6)(b)(7) ("valid search warrant"); Mont. Code Ann. §§ 37-7-1506(1)(e), 46-4-301(3) (subpoena issued upon affidavit stating probable cause); N.H. Rev. Stat. Ann. § 318-B:35(I)(b)(3) ("court order based on probable cause"); Or. Rev. Stat. § 431.966(2)(a)(C) ("valid court order based on probable cause"). In addition, Vermont bars access to prescription records in its prescription monitoring program by law enforcement directly or on request. Vt. Stat. Ann. tit. 18, § 4284. Maine and Nebraska's laws establishing those states' prescription drug monitoring programs are silent on law enforcement access. Me. Rev. Stat. tit. 22, § 7250(4); Neb. Rev. Stat. § 71-2455.

The trend over time has been toward inclusion of a probable cause requirement. Long-term trends in state practices, even when not unanimous, can inform the Fourth Amendment

analysis. *See Garner*, 471 U.S. at 18 ("It cannot be said that there is a constant or overwhelming trend away from the common-law rule. . . . Nonetheless, the long-term movement has been away from the rule that deadly force may be used against any fleeing felon, and that remains the rule in less than half the States."). The nine states that require probable cause all have adopted or reasserted this standard within the last decade. And of the seven states to enact or update prescription drug monitoring statutes in the last two years, four require probable cause for law enforcement access and one makes no provision for law enforcement access at all. *Compare* 2012 N.H. Adv. Legis. Serv. 196 (LexisNexis), 2011 Ga. Laws 659, § 2, 2011 Mont. Laws ch. 241, § 7 (relevant terms defined in Mont. Code Ann. § 46-4-301(3)), 2011 Neb. Laws 237, *and* 2011 Ark. Acts 304, *with* 2011 Md. Laws 166 *and* 2011 Tenn. Pub. Acts 310, § 3. Thus, the trend in the states is toward adoption of greater protections against unjustified law enforcement access.

Additionally, a number of state courts have held that individuals have a reasonable expectation of privacy in medical records under state constitutional provisions or the Fourth Amendment. *See State v. Skinner*, 10 So. 3d 1212, 1218 (La. 2009) ("[A]bsent the narrowly drawn exceptions permitting warrantless searches, we hold a warrant is required to conduct an investigatory search of medical and/or prescription records."); *King v. State*, 535 S.E.2d 492, 495 (Ga. 2000) ("[A] patient's medical information, as reflected in the records maintained by his or her medical providers, is certainly a matter which a reasonable person would consider to be private."); *State v. Nelson*, 941 P.2d 441, 449 (Mont. 1997) ("We hold that in order to establish that there is a compelling state interest for the issuance of an investigative subpoena for the discovery of medical records, the State must show probable cause . . . ."); *Commonwealth v. Riedel*, 651 A.2d 135, 139–40 (Pa. 1994) (holding that probable cause is required for access to

medical records because "appellant does have a reasonable expectation of privacy in his medical records"); *State v. Copeland*, 680 S.W.2d 327, 330–31 (Mo. Ct. App. 1984) (requiring probable cause for the results of blood tests because, "[f]ollowing the law and common practice, it is normally expected that a patient's disclosures to a hospital will be kept confidential").

Further, a majority of states recognize a physician-patient privilege as a matter of state law. No physician-patient privilege existed at common law, but 42 states and the District of Columbia have created one through legislation.[23] These privileges, like the other state privacy protections discussed above, function to assure patients of the confidentiality of their medical information and form part of the basis upon which patients' expectations of privacy are formed. *Cf. DeMassa v. Nunez*, 770 F.2d 1505, 1506 (9th Cir. 1985) (per curiam) (discussing attorney-client privilege as a source of clients' reasonable expectation of privacy in their client files held by an attorney).[24]

_____

[23] Alaska R. Evid. 504; Ariz. Rev. Stat. Ann. § 12-2235 (2013); Ark. R. Evid. 503; Cal. Evid. Code §§ 990–1007 (West 2013); Colo. Rev. Stat. § 13-90-107(d) (2013); Conn. Gen. Stat. Ann. § 52-146o (West 2013); Del. Unif. R. Evid. 503; D.C. Code Ann. § 14-307 (2013); Fla. Stat. Ann. § 456.057 (West 2013); Haw. Rev. Stat. § 616-1 (West 2013); Idaho Code Ann. § 9-203.4 (West 2013); 735 Ill. Comp. Stat. Ann. 5/8-802 (West 2013); Ind. Code Ann. § 34-46-3-1 (West 2013); Iowa Code Ann. § 622.10 (West 2013); Kan. Stat. Ann. § 60-427 (West 2012); La. Code Evid. Ann. art. 510 (2012); Me. R. Evid. 503; Mich. Comp. Laws Ann. § 600.2157 (West 2013); Minn. Stat. Ann. § 595.02 (West 2013); Miss. Code Ann. § 13-1-21 (West 2013); Mo. Ann. Stat. § 491.060 (West 2013); Mont. Code Ann. § 26-1-805 (West 2013); Neb. Rev. Stat. Ann. § 27-504 (West 2012); Nev. Rev. Stat. Ann. § 49.215 (West 2011); N.H. Rev. Stat. Ann. § 329:26 (2013); N.J. Stat. Ann. § 2A:84A-22.2 (West 2013); N.M. R. Evid. 11-504; N.Y. C.P.L.R. 4504 (McKinney 2013); N.C. Gen. Stat. Ann. § 8-53 (West 2013); N.D. R. Evid. 503; Ohio Rev. Code Ann. § 2317.02(B) (West 2013); Okla. Stat. Ann. tit. 12, § 2503 (West 2013); Or. Rev. Stat. Ann. § 40.235 (West 2013); 42 Pa. Cons. Stat. Ann. § 5929 (West 2013); R.I. Gen. Laws Ann. § 5-37.3-4 (West 2012); S.D. Codified Laws § 19-13-6 (2012); Tex. R. Evid. 509; Utah Code Ann. § 78B-1-137 (West 2012); Vt. Stat. Ann. tit. 12, § 1612 (West 2013); Va. Code Ann. § 8.01-399 (West 2013); Wash. Rev. Code Ann. § 5.60.060 (West 2013); Wis. Stat. Ann. § 905.04 (West 2013); Wyo. Stat. Ann. § 1-12-101 (West 2013).

[24] Federal law also recognizes the heightened privacy interest in medical records. *See* Privacy Protection Act, 42 U.S.C. §§ 2000aa-11(a)(3) (the Attorney General must recognize "special concern for privacy interests in cases in which a search or seizure for such documents could

      iv.    Prescription records can reveal types of information that are particularly sensitive and receive heightened protections.

Records in the PDMP can indicate facts about patients' sex, sexuality, and sexually transmitted infections, mental health, and substance abuse. These areas "are highly sensitive, even relative to other medical information." *Norman-Bloodsaw*, 135 F.3d at 1269; *see also* Peel Decl. ¶ 15.

A prescription for Marinol can reveal that a patient is being treated for AIDS. Peel Decl. ¶ 7.b; Wessler Decl. Ex. P. As the Ninth Circuit has held, "[i]ndividuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition." *Doe,* 15 F.3d at 267; *accord Doe*, 941 F.2d at 795–96.

> This would be true for any serious medical condition, but is especially true with regard to those infected with HIV or living with AIDS, considering the unfortunately unfeeling attitude among many in this society toward those coping with the disease. An individual revealing that she is HIV seropositive potentially exposes herself not to understanding or compassion but to discrimination and intolerance, further necessitating the extension of the right to confidentiality over such information.

*Doe,* 15 F.3d at 267.

A prescription for testosterone can reveal both that a person is transgender or transsexual and the stage of his transition from female to male sex. Peel Decl. ¶ 7.a; Doe 2 Decl. ¶¶ 6–14, 20. This is highly private information that can expose a person to discrimination and opprobrium. *See Smith v. City of Salem, Ohio*, 378 F.3d 566, 568–69, 575 (6th Cir. 2004) (discussing discrimination against person diagnosed with gender identity disorder and holding that such discrimination violates Title VII); *Doe v. Blue Cross & Blue Shield*, 794 F. Supp. 72, 74 (D.R.I. 1992) (permitting use of pseudonym to bring suit because, "[a]s a transsexual, plaintiff's privacy

---

intrude upon a known confidential relationship such as that which may exist between . . . doctor and patient"); HIPAA Privacy Rule, 45 C.F.R. § 164.512 (setting rules to protect confidentiality of protected health information); *see also* Peel Decl. ¶¶ 10, 15.

27 – MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

interest is both precious and fragile, and this Court will not cavalierly permit its invasion"); *see also* Jaime M. Grant et al., Injustice at Every Turn: A Report of the National Transgender Discrimination Survey 2 (2011),[25] Wessler Decl. Ex. QQ ("Transgender . . . people face injustice at every turn: in childhood homes, in school systems that promise to shelter and educate, in harsh and exclusionary workplaces, at the grocery store, the hotel front desk, in doctors' offices and emergency rooms, before judges and at the hands of landlords, police officers, health care workers and other service providers.").

A number of medications tracked in the PDMP are used to treat mental illness, including panic disorders, anxiety disorders, and post traumatic stress disorder. Peel Decl. ¶ 7.d–7.e; Doe 3 Decl. ¶¶ 14–17; Wessler Decl. Exs. E, H, J, U, Y, BB, DD, EE. Information about mental health and mental illness is similarly sensitive and is afforded particularly strong privacy protections. *See Jaffee v. Redmond*, 518 U.S. 1, 10 (1996) (establishing federal psychotherapist-patient privilege and explaining that "[b]ecause of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace"); *Sorn v. Barnhart*, 178 F. App'x 680, 681 (9th Cir. 2006) (noting "the lingering social stigma of admitting to mental illness"); *Doe v. Provident Life & Accident Ins. Co.*, 176 F.R.D. 464, 468 (E.D. Pa. 1997) ("[I]n our society, there is a significant stigma associated with being identified as suffering from a mental illness.").

Finally, drugs tracked by the PDMP reveal information about substance abuse addiction and treatment: prescriptions for methadone can reveal that patients are in treatment for heroin addiction, and prescriptions for chlordiazepoxide (Librium) and oxazepam (Serax) can reveal

---

[25] *Available at* http://www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

treatment for alcohol addiction withdrawal. Peel Decl. ¶ 7.f–7.g; Wessler Decl. Ex. N. These records, too, are deeply private and can expose a patient to stigma. Indeed, Congress has specifically imposed heightened confidentiality protections for substance abuse treatment records and has limited access to them by law enforcement and in criminal proceedings. 42 U.S.C. § 290dd-2; *see also Doe v. Broderick*, 225 F.3d 440, 450–51 (4th Cir. 2000) (citing § 290dd-2 as support for its holding that patients of substance abuse treatment centers have a reasonable expectation of privacy in their treatment records under the Fourth Amendment); Rothstein Decl. ¶ 11.

In short, "medical treatment records contain intimate and private details that people do not wish to have disclosed, expect will remain private, and, as a result, believe are entitled to some measure of protection from unfettered access by government officials." *Broderick*, 225 F.3d at 451. The expectation of privacy in prescription records and the medical information they reveal is recognized by society as reasonable.

III.    The State of Oregon's Limited Ability to Access Records in the PDMP Does Not Eliminate Patients' Reasonable Expectation of Privacy in those Records.

A person has a reasonable expectation of privacy in prescription records regardless of whether they are in the hands of a third party. Cases allowing law enforcement to obtain records using an administrative subpoena sometimes state that there is no reasonable expectation of privacy in some records in the possession of a third party business. *E.g. Golden Valley Elec. Ass'n*, 689 F.3d at 1116. The Supreme Court's decisions in *United States v. Miller*, 425 U.S. 435 (1976), and *Smith v. Maryland*, 442 U.S. 735 (1979), which hold that there is no reasonable expectation of privacy in certain records turned over to a bank and in the telephone numbers a person dials, do not reach the searches at issue in this case, however. Plaintiffs-Intervenors and

other Oregon residents retain a reasonable expectation of privacy in their prescription records contained in the PDMP.

In *Miller*, the Court held that a bank depositor had no expectation of privacy in records about his transactions that were held by the bank. Although the Court explained that the records were the bank's business records, 425 U.S. at 440, it proceeded to inquire whether Miller could nonetheless maintain a reasonable expectation of privacy in the records: "We must examine the nature of the particular documents sought to be protected in order to determine whether there is a legitimate 'expectation of privacy' concerning their contents." *Id.* at 442. The Court's ultimate conclusion—that Miller had no such expectation—turned not on the fact that the records were owned or possessed by the bank, but on the fact that Miller "voluntarily conveyed" the information contained in them to the bank and its employees. *Id.*

In *Smith*, the Court held that the use of a pen register to capture the telephone numbers a person dials was not a search under the Fourth Amendment. 442 U.S. at 739, 742. The Court relied heavily on the fact that when dialing a phone number the caller "voluntarily convey[s] numerical information to the telephone company." *Id.* at 744. As in *Miller*, in addition to establishing voluntary conveyance the *Smith* Court also assessed the degree of invasiveness of the surveillance at issue to determine whether the user had a reasonable expectation of privacy. The Court noted the "pen register's limited capabilities," *id.* at 742, explaining that "'a law enforcement official could not even determine from the use of a pen register whether a communication existed.'" *Id.* at 741 (quoting *United States v. New York Tel. Co.,* 434 U.S. 159, 167 (1977)).

Assessing an individual's expectation of privacy in prescription records in the PDMP thus turns on whether the contents of the records were voluntarily conveyed to the PDMP, and

what privacy interest a person retains in those records. Unlike the cancelled checks at issue in *Miller* and the dialed telephone numbers in *Smith*, the prescription records contained in the PDMP were not voluntarily conveyed to the State of Oregon. Oregon law requires pharmacists to report all prescriptions for schedule II–IV drugs to the PDMP. Or. Rev. Stat. § 431.964(1). Even if disclosure of one's medical condition to the doctor and the prescription to treat that condition to the pharmacist can be deemed "voluntary," the pharmacist's conveyance of the prescription to the PDMP involves no volition by or even knowledge of the patient. The Third Circuit reached the same conclusion with regard to cell phone location records, holding that cell phone users retain a reasonable expectation of privacy in their location information—even though wireless providers keep records of the cell towers a phone was connected to at the start and end of each call—because "[a] cell phone customer has not 'voluntarily' shared his location information with a cellular provider in any meaningful way." *In re Application of the U.S. for an Order Directing a Provider of Elec. Commc'ns Serv. to Disclose Records to the Gov't*, 620 F.3d 304, 318–19 (3d Cir. 2010).

Moreover, the decision to visit a physician and pharmacist to obtain urgent medical treatment is not in any meaningful sense voluntary. Obtaining medical care for a serious emergent or chronic condition such as AIDS, acute pain, seizure disorders, panic or anxiety disorders, or heroin addiction is a course of action dictated by one's physical and psychological ailments. Opting to forgo care can leave a person debilitated or dead. As one court has explained, "the rule in *Miller* pertains to objects or information *voluntarily* turned over to third parties. A decision to use a bank may be voluntary. A decision to use a hospital for emergency care is not. We conclude that appellant did not surrender standing to assert his privacy rights when he

entered the emergency room." *Thurman v. State*, 861 S.W.2d 96, 98 (Tex. App. 1993) (citation omitted).

Prescription records also qualify for protection on the second dimension identified by *Miller* and *Smith*: the privacy interest a person retains in them. Bank records and dialed phone numbers reveal some private details of a person's life, but they are not nearly as revealing of private information as are prescription records and the sensitive medical information they disclose. *See Thurman*, 861 S.W.2d at 98 ("We believe that medical records are entitled to more privacy than bank records and phone records."). Indeed, courts have specifically held that patients retain a reasonable expectation of privacy in their prescription or medical records notwithstanding the fact that a third party has access to them. *King v. State*, 535 S.E.2d 492, 495 (Ga. 2000) ("Even if the medical provider is the technical 'owner' of the actual records, the patient nevertheless has a reasonable expectation of privacy in the information contained therein, since that data reflects the physical state of his or her body."); *Doe v. Broderick*, 225 F.3d 440, 450 (4th Cir. 2000) (holding that there is a reasonable expectation of privacy in substance abuse treatment records held by a methadone clinic and distinguishing *Miller*). Because medical records are inherently and deeply private, *supra* Part II.B, they require the highest protection the Fourth Amendment offers. *See Golden Valley Elec. Ass'n*, 689 F.3d at 1116 (suggesting that search terms entered into Google are more inherently private than electricity usage records and thus would receive greater Fourth Amendment protection).

Recognizing a reasonable expectation of privacy in prescription records is consistent with cases in which courts have found a reasonable expectation of privacy in other types of records that have been handled by a third party. For example, in *DeMassa v. Nunez*, 770 F.2d 1505, 1506 (9th Cir. 1985) (per curiam), the Ninth Circuit held that "clients of an attorney maintain a

legitimate expectation of privacy in their client files." The court identified the source of this

reasonable expectation of privacy "in federal and state statutes, in codes of professional

responsibility, under common law, and in the United States Constitution." *Id.* at 1506–07. The

fact that the files were in the possession of the attorney, not the client, did not undermine the

protections of the Fourth Amendment. *Id.* at 1507; *accord United States v. Knoll*, 16 F.3d 1313,

1321 (2d Cir. 1994) ("[T]he protection of the Fourth Amendment extends to those papers that a

person leaves with his or her lawyer."); *see also United States v. Warshak*, 631 F.3d 266, 285

(6th Cir. 2010) (holding that there is a reasonable expectation of privacy in the contents of emails

even though email is sent through an internet service provider's servers). Likewise, that

Plaintiffs-Intervenors' prescription records are in the PDMP's database does not vitiate the

otherwise-reasonable expectation of privacy in them.

In light of the high expectation of privacy in prescription records and the medical

information they reveal, *supra* Part II.B, *Miller* and *Smith* do not apply to the medical records at

issue here.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs-Intervenors' motion for

summary judgment.

Dated: July 1, 2013                        Respectfully submitted,

                                           /s/ Nathan Freed Wessler
                                           _____
                                           Nathan F. Wessler (*pro hac vice*)
                                           Ben Wizner (*pro hac vice*)
                                           American Civil Liberties Union Foundation
                                           125 Broad Street, 18th Floor
                                           New York, NY 10004
                                           Tel.: (212) 549-2500
                                           Fax: (212) 549-2654
                                           Kevin Díaz (OSB No. 970480)

33 – MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

/s/ Kevin Díaz
_____

ACLU Foundation of Oregon
PO Box 40585
Portland, OR 97240
Tel.: (503) 227-6928
Fax: (503) 227-227-6948

*Counsel for Plaintiffs-Intervenors*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b),

54-1(c), or 54-3(e) because it contains 10,577 words, including headings, footnotes, and

quotations, but excluding the caption, table of contents, table of authorities, signature block, and

any certificates of counsel.


Dated: July 1, 2013


/s/ Nathan Freed Wessler

_____

Nathan Freed Wessler