Kevin Díaz, OSB No. 970480
Email: kdiaz@aclu-or.org
**ACLU Foundation of Oregon**
PO Box 40585
Portland, OR 97240
Tel.: (503) 227-6928; Fax: (503) 227-6948

Nathan Freed Wessler *(pro hac vice)*
Email: nwessler@aclu.org
Ben Wizner *(pro hac vice)*
Email: bwizner@aclu.org
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500; Fax: (212) 549-2654

    Attorneys for the Plaintiffs-Intervenors

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **OREGON PRESCRIPTION DRUG MONITORING PROGRAM**, an agency of the **STATE OF OREGON**,<br><br>    Plaintiff,<br><br>    v.<br><br>**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION**, an agency of the **UNITED STATES DEPARTMENT OF JUSTICE**,<br><br>    Defendant. | Case No.: 3:12-cv-02023-HA<br><br>**DECLARATION OF DR. JAMES ROE IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR SUMMARY JUDGMENT** |

**JOHN DOE 1, et al.,**

    Plaintiffs-Intervenors,

            v.

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION**, an agency of the **UNITED STATES DEPARTMENT OF JUSTICE,**

    Defendant in Intervention.

I, James Roe, M.D.,[1] hereby declare and state as follows:

1.    I submit this declaration based on my personal knowledge in support of Plaintiffs-Intervenors' Motion for Summary Judgment, in the above-captioned case.

2.    I am one of the Plaintiff-Intervenors in this action.

3.    I am a medical doctor working as a general internist who primarily treats geriatric and hospice patients.

4.    I am licensed to practice medicine in both Oregon and Washington. I have completed a pain management education program as required under Oregon law for physicians who regularly treat patients in chronic or terminal pain. I am also a member of the Oregon Medical Association.

5.    I hold a current controlled substance registration certificate from the Drug Enforcement Administration ("DEA") permitting me to prescribe medications classified in all schedules (other than schedule I) under the Controlled Substances Act.

---

[1] This is not my real name. I am proceeding under a pseudonym in order to protect my constitutional right to privacy. The use of the name "James Roe" and gender pronouns is not intended to signify that I am either male or female.

6. Approximately half of my patients are Oregon residents. I split my time evenly between practicing medicine in Oregon and Washington.

7. I specialize in geriatrics and the treatment of hospice patients with terminal illnesses. Most of the hospice patients I treat survive less than six months.

8. Most of the patients I treat in Oregon are admitted to intermediate care facilities, including rehabilitation centers and nursing homes. My treatment of these patients includes prescribing them appropriate and medically necessary medications. When my patients are at an institutional facility, their prescriptions are typically filled by institutional pharmacies.

9. I frequently have patients who are discharged from hospitals or skilled care facilities. I write prescriptions for such patients on a nearly daily basis. Those prescriptions are usually filled at retail pharmacies. For example, I recently treated a patient with a compound fracture who returned home after a stay in the hospital. The only effective treatment for this patient's pain was a prescription for a narcotic painkiller on the Controlled Substances Act schedule list.

10. I also treat patients who are not yet enrolled in hospice or skilled care programs who require prescriptions for schedule II–IV drugs. For example, I recently prescribed narcotic painkillers to an 86-year-old patient with a terminal illness who was waiting to be formally enrolled in a hospice program and was suffering from acute pain. If I had not prescribed him a painkiller on the schedule list, he would have had to go to the emergency room to receive pain medication.

11. In the past, I have treated a number of hospice patients and other patients who were receiving care at home. The life duration of these patients were most often only 3-6 months.

3 - DECLARATION OF PLAINTIFF-INTERVENOR JAMES ROE

12. My practice deals largely with end-of-life care for people suffering from diseases such as cancer, AIDS, chronic obstructive pulmonary disease, and emphysema. I also treat geriatric patients, including patients recovering from traumatic injuries caused by falls and patients with chronic pain.

13. As compared with physicians in other specialties, a disproportionate number of the medications I prescribe are classified in schedules II–IV under the Controlled Substances Act.

14. The most common schedule II–IV medications I prescribe are:

14.1. Long-acting opiate painkillers, including morphine extended release, oxycodone extended and immediate release, and oral morphine solution, which can be absorbed sublingually by patients who can no longer swallow. These medications are classified in schedule II under the Controlled Substances Act.

14.2. Vicodin, which is a narcotic painkiller containing hydrocodone. Vicodin is classified in schedule III under the Controlled Substances Act.

14.3. Drugs in the benzodiazepine group, including Xanax, Ativan, Klonopin, and Valium, among others. These medications are used to treat anxiety, and are classified in schedule IV under the Controlled Substances Act.

15. I only prescribe schedule II–IV drugs when they are necessary for the treatment of my patients' medical conditions. For example, many of my patients in hospice experience severe pain, and opiate or narcotic painkillers are necessary to provide palliative care in the final months of their lives. For patients with severe shortness of breath caused by lung cancer or chronic obstructive pulmonary disease, I frequently prescribe drugs in the benzodiazepine group to reduce the anxiety and panic caused by the feeling of being unable to breathe.

16. The prescriptions for schedule II–IV drugs that I write for Oregon patients, except for hospital inpatients whose prescriptions are dispensed by the hospital, are recorded in the Oregon Prescription Drug Monitoring Program ("PMDP").

17. The prescriptions for schedule II–V drugs that I write for Washington patients, except for hospital inpatients whose prescriptions are dispensed by the hospital, are recorded in the Washington Prescription Monitoring Program ("Washington PMP").

18. Over the course of my medical career, I have witnessed the effects of initiatives by the state and federal governments and medical organizations that have raised the profile of prescription drug abuse and diversion. In my experience, pain management guidelines and standardized practices introduced through these initiatives have been effective in limiting drug diversion and abuse.

19. I believe that drug abuse and diversion is a serious public health problem, and I do not oppose law enforcement investigations into drug diversion that are supported by evidence of wrongdoing and are not overly invasive of the doctor-patient relationship. I object to law enforcement requests for confidential medical information not supported by a warrant and probable cause.

20. During my nearly 30 years in private practice, I have seen how the scrutiny of physicians, nurse practitioners, and physician assistants by law enforcement has increased steeply. I have seen a marked change in the willingness of medical professionals to prescribe schedule II, III, or IV pain medications because they fear being investigated by state or federal law enforcement, including the DEA.

21. Even in situations where patients are experiencing dire and debilitating pain, I have seen the results of many physicians becoming unwilling to issue prescriptions for medically

5 - DECLARATION OF PLAINTIFF-INTERVENOR JAMES ROE

necessary narcotic painkillers because they fear scrutiny by law enforcement. This is because law enforcement investigations of physicians are time-consuming, invasive, and can seriously harm careers. If it becomes publicly known that a physician has been investigated, even if no wrongdoing was found, it can result in loss of business, sanctions by employers, and increased medical malpractice insurance costs.

22.     The increasing reluctance of other physicians, including specialists, who treat my patients to prescribe scheduled drugs has put increased pressure on me to provide necessary prescriptions. I have had a number of cases where a patient needs strong pain medications following surgery, but where the treating surgeon, internist, and pain specialist refuse to incur the risk of associating their names with narcotic painkiller prescriptions. As a result, I am left on the hook as the last and only alternative available for patients with acute pain, and I provide prescriptions for scheduled painkillers when necessary to treat the patient's pain.

23.     I have encountered other physicians who are willing to provide short-term prescriptions for schedule II or III painkillers, but insist that after four weeks patients get their prescriptions refilled at pain clinics instead of issuing prescription refills themselves. I believe this interrupts continuity of care, which is particularly important for vulnerable patients with terminal illnesses. For many nursing home and hospice patients who are unable to travel, attending a pain clinic is not a realistic option because it is often not physically possible. They need to have access to prescriptions for appropriate pain medications from their treating doctors so that they can take those medications at home or in the intermediate care facility where they are being cared for.

24. I do not think it is an exaggeration to say that overzealous law enforcement investigations of physicians have created a climate of fear around prescribing narcotic painkillers in cases where they are, by any objective standard, medically necessary.

25. Federal law enforcement agents recently arranged a meeting with me. Two FBI agents attended the interview in person. A DEA agent participated in the interview by phone.

26. The agents asked me questions about my prescribing practices. They were particularly interested in a small number of my patients to whom I had prescribed pain medications classified in schedules II and III. They had the patients' names, and asked me to provide their diagnoses, the treatment they received, and what setting I had seen them in. The agents also asked for the addresses and contact information of the patients regardless of whether or not they were deceased.

27. All of the patients were residents of Washington. I had treated some of them as outpatients and some in institutional settings.

28. I refused to provide the agents with the confidential medical information about my patients because doing so would have violated my duty of confidentiality as their treating physician. Maintaining confidentiality and privacy of patients' medical information is crucial to the doctor-patient relationship and is an ethical and professional responsibility of physicians.

29. When I would not turn over the requested information, the DEA agent threatened me by stating that he could get an administrative order that day to revoke my state medical licenses and my DEA controlled substance registration certificate. Without these, I would not be able to practice medicine.

30. I asked the agents if there were any disciplinary actions or criminal charges pending against me. They told me that there were not, but they continued to pressure me. Their

questions suggested that they believed I was prescribing medications that were being diverted to illegal uses.

31. I also asked how they had come by the names of these patients, what their source was for the names, and why they were asking me about them. Specifically, I asked whether they had obtained my prescription records from the Washington PMP. The agents refused to answer. The agents did not produce a warrant for the information they had obtained or for the information they were seeking.

32. I believe that the agents obtained my prescription records for these patients from the Washington PMP. I treated these patients in different clinical settings and at different times. I do not know of another source from which the agents could have easily obtained information about such a disparate set of patients.

33. Although all of the patients under discussion were Washington residents, I believe it likely that the agents also requested my prescription records for Oregon patients from the Oregon PDMP. Because my practice is equally divided between Washington and Oregon, an investigation by federal law enforcement officials of my Washington prescribing practices only would miss fifty percent of my prescribing activities.

34. While it is possible that the agents were only investigating my Washington prescribing practices, I believe it is equally likely that they requested my prescription records from the Oregon PDMP but that the State of Oregon refused to provide them. But for whatever reason, unlike similar medical treatment I had provided to patients in Washington, they did not identify anything they believed was suspicious in my Oregon prescribing practices.

35. I was shaken and intimidated by the interview with the DEA and FBI agents. I was particularly disturbed by the ease with which they were apparently able to obtain my

Washington prescription records and by their failure to explain a good reason for investigating me and my patients.

36. Since the interview I have changed my prescribing practices. I am more reticent to prescribe schedule II–IV drugs to existing patients. I have also decided to stop making house calls to patients who are not in skilled care facilities or other institutions. I fear that prescribing scheduled drugs to such patients opens me up to undeserved suspicion by law enforcement. When my patients return home from a stay in a hospital or skilled care facility, I have started requiring them to make an appointment within one week with another doctor (either a local general practitioner or a local pain clinic) so someone else can take over prescribing any required schedule II–IV medications. These decisions create a barrier between the doctor and patient relationship and have caused me to lose some income.

37. These changes are a reaction to the ease with which federal law enforcement can obtain my prescription records and commence an investigation of me and my fear of being subjected to further unwarranted investigation.

38. Federal law enforcement agents have continued to investigate me. The DEA served me with a Notice of Inspection of Controlled Premises. They met me at my home, where I keep my office, and inquired about prescriptions for controlled substances that I had provided to three terminally ill patients in Washington. I last treated those patients in 2011 and 2012, and they are now deceased. The agents requested that I turn over treatment records for those patients.

39. Most recently, while I and my family were away from home, law enforcement agents entered my locked home pursuant to a search warrant signed by a Washington judge. The warrant authorized seizure of "[a]ny and all records and items related to prescribing and distribution of controlled substances." When I returned home, I found a copy of the warrant and

saw that papers in my home office had been inspected and moved. To my knowledge, no papers or property were removed from my home or office. Law enforcement has not contacted me since conducting this search.

      40.      I fear that the DEA and FBI might intensify their scrutiny of my prescribing practices and bring me in for further intimidating and time-consuming interviews. I also fear that if it becomes publicly known that the DEA and FBI have interviewed and investigated me, the state medical licensing bodies in Washington and Oregon may investigate me, which would distract me from my medical practice and could require me to expend resources defending my medical license against ultimately unsubstantiated suspicion.

      41.      I also fear that, even though no charges have been brought against me and I have been presented with no evidence of wrongdoing, my malpractice insurance rates could go up if it were publicly known that the DEA and FBI obtained my prescription records and interviewed and investigated me.

      42.      Finally, as a small practitioner not employed by a hospital or other large institution, it could be devastating to my practice if it was publicly known that I had been investigated. I fear that skilled care and hospice facilities would not want to work with me any longer, and that patients would not want me to treat them. Indeed, law enforcement agents have visited several medical facilities where I worked on a contract basis and questioned staff about my prescribing practices. Subsequently my contracts with two facilities of these were not renewed, without explanation. I suspect that this is a result of the suspicion cast by the law enforcement agents. I have lost significant income as a result of the nonrenewal of these contracts. This type of incident, if repeated, would destroy my livelihood.

10 - DECLARATION OF PLAINTIFF-INTERVENOR JAMES ROE

43. My prescription records reflect sensitive and confidential medical information about my patients and can reveal private details about their diagnoses and prognoses. The government should only have access to such information with extremely strong justifications.

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

DATED this 28th day of June, 2013.

*James Roe, M.D.*[2]

---

[2] As noted above, this is a pseudonym.

11 - DECLARATION OF PLAINTIFF-INTERVENOR JAMES ROE