Kevin Díaz, OSB No. 970480
Email: kdiaz@aclu-or.org
**ACLU Foundation of Oregon**
PO Box 40585
Portland, OR 97240
Tel.: (503) 227-6928; Fax: (503) 227-6948

Nathan Freed Wessler *(pro hac vice)*
Email: nwessler@aclu.org
Ben Wizner *(pro hac vice)*
Email: bwizner@aclu.org
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500; Fax: (212) 549-2654

Attorneys for the Plaintiffs-Intervenors

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **OREGON PRESCRIPTION DRUG MONITORING PROGRAM**, an agency of the **STATE OF OREGON**,<br><br>    Plaintiff,<br><br>        v.<br><br>**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION**, an agency of the **UNITED STATES DEPARTMENT OF JUSTICE**,<br><br>    Defendant. | Case No.: 3:12-cv-02023-HA<br><br>**PLAINTIFFS-INTERVENORS' COMBINED RESPONSE TO DEFENDANT DEA'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS-INTERVENORS' MOTION FOR SUMMARY JUDGMENT**<br><br> Request for Oral Argument |

**JOHN DOE 1, et al.,**

        Plaintiffs-Intervenors,

                v.

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION**, an agency of the **UNITED STATES DEPARTMENT OF JUSTICE,**

        Defendant in Intervention.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 2

    I. The DEA Has Violated Intervenors' Reasonable Expectation of Privacy in their
    Prescription Records .................................................................................... 2

        A.   Intervenors Have a Reasonable Expectation of Privacy in Their Records in the
            PDMP .................................................................................................. 2

        B.   Where There is a Reasonable Expectation of Privacy, a Warrant is Required .......... 6

        C.   The "Third Party Doctrine" Does Not Apply to Intervenors' Records ...................... 7

    II.     Article III Erects No Barrier to Justiciability of This Case ...................................... 11

        A.   Intervenors Need Not Demonstrate Independent Article III Standing .................... 11

        B.   Intervenors Have Article III Standing .................................................................... 14

            1.     Intervenors are suffering actual present injuries that are fairly traceable to
                 the DEA's use of administrative subpoenas under 21 U.S.C. § 876 ............... 15

            2.     Intervenors face a substantial risk of impending injury from the DEA's use
                 of administrative subpoenas under 21 U.S.C. § 876 .......................................... 19

            3.     Dr. Roe has standing to advance the Fourth Amendment rights of his
                 patients ............................................................................................................. 28

        C.   Intervenors' Claims are Ripe .................................................................................. 32

CONCLUSION ................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)........................................................33

*Allen v. Wright*, 468 U.S. 737 (1984) ....................................................................15

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997) ..........................................11, 13

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)................................20, 34

*Baker v. Carr*, 369 U.S. 186 (1962)........................................................................15

*Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822 (2002) ..................................20

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Reich*, 40 F.3d 1275 (D.C. Cir. 1994)...............13

*Bowsher v. Synar*, 478 U.S. 714 (1986)....................................................................14

*Cal. Dep't of Soc. Servs. v. Thompson*, 321 F.3d 835 (9th Cir. 2003)....................................12

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) .............................28, 29

*Cent. Arizona Water Conservation Dist. v. E.P.A.*, 990 F.2d 1531 (9th Cir. 1993) ...............24

*Chandler v. Miller*, 520 U.S. 305 (1997).....................................................................20

*Chapman v. United States*, 365 U.S. 610 (1961) ..........................................................9

*Chiles v. Thornburgh*, 865 F.2d 1197 (11th Cir. 1989) ..................................................12, 14

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ............................................... passim

*Compassion in Dying v. Washington*, 79 F.3d 790 (9th Cir. 1996)........................................29

*Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925 (9th Cir. 2008)..............24

*Craig v. Boren*, 429 U.S. 190 (1976)........................................................................31

*Diamond v. Charles*, 476 U.S. 54 (1986). ..................................................................12, 13

*Didrickson v. U.S. Dept. of Interior*, 982 F.2d 1332 (9th Cir. 1992)....................................12

*Doe v. Chao*, 540 U.S. 614 (2004)...........................................................................23

*Doe v. Se. Pa. Transp. Auth.*, 72 F.3d 1133 (3d Cir. 1995) ..............................................10

*Douglas v. Dobbs*, 419 F.3d 1097 (10th Cir. 2005)........................................................4

*Fair Employment Council of Greater Wash., Inc. v. BMC Marketing Corp.*, 28 F.3d 1268 (D.C. Cir. 1994)...................................................................................29

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001) .......................................................4

*Flores v. Arizona*, 516 F.3d 1140 (9th Cir. 2008)..........................................................12

*Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431 (9th Cir. 1996) ...........................33

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ........................................................29

*Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754 (9th Cir. 2004) ...................20

*Hodgson v. United Mine Workers of America*, 51 F.R.D. 270 (D.D.C. 1970) .......................13

*In re Search Warrant,* 810 F.2d 67 (3d Cir. 1987) ........................................................29

*In re Subpoenas Duces Tecum*, 51 F. Supp. 2d 726 (W.D. Va. 1999) ...................................29

*Jewel v. Nat'l Sec. Agency*, 673 F.3d 902 (9th Cir. 2011). ................................................15, 16

*Katz v. United States*, 389 U.S. 347 (1967) ................................................................7, 9

*Krottner v. Starbucks Corp.*, 628 F.3d 1139 (9th Cir. 2010)............................................20, 23

*Kyllo v. United States*, 533 U.S. 27 (2001).................................................................4, 27

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................14

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ................................................................ passim

*Mausolf v. Babbitt*, 85 F.3d 1295 (8th Cir. 1996).......................................................13

*Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011) ...........................................19, 24

*McConnell v. FEC*, 540 U.S. 93 (2003)..........................................................................13

*Minnesota v. Carter*, 525 U.S. 83 (1998) .....................................................................2

*Minnesota v. Olson*, 495 U.S. 91 (1990)........................................................................9

*Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743 (2010)......................................20, 21

*O'Connor v. Ortega*, 480 U.S. 709 (1987) ...................................................................3

*Pagano v. Oroville Hosp.,* 145 F.R.D. 683 (E.D. Cal. 1993) ................................................29

*Pennell v. City of San Jose*, 485 U.S. 1 (1988)................................................................20

*Perry v. Proposition 8 Official Proponents*, 587 F.3d 947 (9th Cir. 2009). ............................11

*Perry v. Schwarzenegger*, 630 F.3d 898 (9th Cir. 2011) ................................................12

*Portland Audubon Soc'y v. Hodel*, 866 F.2d 302 (9th Cir. 1989) .....................................12, 14

*Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006)..........................................................11

*Purnell v. City of Akron*, 925 F.2d 941 (6th Cir. 1991) .................................................13

*Rakas v. Illinois*, 439 U.S. 128 (1978)............................................................................7

*Ruiz v. Estelle*, 161 F.3d 814 (5th Cir. 1998)..........................................................12, 13, 14

*Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983)...................................11

*San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121 (9th Cir. 1996)..........................18

*San Juan Cnty., Utah v. United States*, 503 F.3d 1163 (10th Cir. 2007)................................13

iii – INTERVENORS' COMBINED RESPONSE AND REPLY BRIEF

*Seaton v. Mayberg*, 610 F.3d 530 (9th Cir. 2010) ....................................................5

*Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947 (1984)................................31

*Singleton v. Wulff,* 428 U.S. 106 (1976) ...........................................................29, 30

*Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602 (1989)........................................20

*State v. Skinner*, 10 So. 3d 1212 (La. 2009) .............................................................4

*Sterner v. U.S. Drug Enforcement Agency*, 467 F. Supp. 2d 1017 (S.D. Cal. 2006)..............29

*Stoner v. California*, 376 U.S. 483 (1964) ................................................................9

*Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810 (9th Cir. 2001) ................14

*Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134 (9th Cir. 1999).......32

*Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985) .......................33

*Trbovich v. United Mine Workers of America*, 404 U.S. 528 (1972) .....................13

*Truth v. Kent Sch. Dist.*, 542 F.3d 634 (9th Cir. 2008)...........................................34

*Tucker v. City of Florence, Ala.*, 765 F. Supp. 2d 1320 (N.D. Ala. 2011) .............28

*Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004) ...................3, 4, 5, 6

*U.S. Postal Serv. v. Brennan*, 579 F.2d 188 (2d Cir. 1978)....................................13

*United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110 (9th Cir. 2004) ....................31

*United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) ..........6, 10

*United States v. George*, No. 1:09cr431 (JCC), 2010 WL 1740814 (E.D. Va. Apr. 26, 2010)........................................................................28

*United States v. Golden Valley Electric Ass'n*, 689 F.3d 1108 (9th Cir. 2012)....................7, 8

*United States v. Ilayayev*, 800 F. Supp. 2d 417 (E.D.N.Y. 2011)............................28

*United States v. Imperial Irrigation Dist.*, 559 F.2d 509 (9th Cir. 1977) ...............11

*United States v. Jacobsen*, 466 U.S. 109 (1984)......................................................9

*United States v. Jones*, 132 S. Ct. 945 (2012)........................................................10

*United States v. Rabinowitz*, 339 U.S. 56 (1950)....................................................27

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669 (1973) ......................................................................24

*United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.* ("*Keith*"), 407 U.S. 297 (1972) ................................................................................17

*United States v. Warshak*, 631 F.3d 266 (2010) ...........................................8, 9, 10

*United States v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3d Cir. 1980).............................30

*Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328 (7th Cir. 1993)................................21

*Whalen v. Roe*, 429 U.S. 589 (1977).................................................................3, 4, 5

*Wolfson v. Brammer*, 616 F.3d 1045 (9th Cir. 2010). .......................................32, 34

*Yniguez v. Arizona*, 939 F.2d 727 (9th Cir. 1991) .................................................11

## Statutes

2013 Or. Laws, ch. 550, § 3...........................................................................16

21 U.S.C. § 876.................................................................................25, 26

50 U.S.C. § 1881a.................................................................................25

Or. Rev. Stat. § 431.966(2)(a)(B) .................................................................9

Or. Rev. Stat. 431.966(2)(a)(C) ..................................................................34

## Other Authorities

Charlie Savage, *N.S.A. Said to Search Content of Messages To and From U.S.*, N.Y. Times, Aug. 8, 2013 .............................................................................................25

John Shiffman & Kristina Cooke, *Exclusive: U.S. Directs Agents to Cover Up Program Used to Investigate Americans*, Reuters (Aug. 5, 2013) ...........................................31

Memorandum from Silvia Calderon, Team Leader Pharmacology, Controlled Substance Staff, Food & Drug Admin., to Douglas Throckmorton, Deputy Dir., Ctr. for Drug Evaluation & Research, Food & Drug Admin. 16 (Oct. 2, 2012)...........................22

## INTRODUCTION

In their opening brief (ECF No. 28), Plaintiffs-Intervenors' ("Intervenors") argue in detail why they have a reasonable expectation of privacy in their prescription records contained in the Oregon Prescription Monitoring Program ("PDMP"). Instead of responding to these arguments, Defendant Drug Enforcement Administration ("DEA") erects a straw man, arguing that Intervenors have no absolute right to informational privacy under the Fourteenth Amendment. That is irrelevant to the Fourth Amendment question in this case. Because Intervenors' prescription records are deeply private and they have not voluntarily relinquished their privacy interest in the records, a warrant is required for DEA access to them.

In cursory response to Intervenors' Fourth Amendment arguments, the DEA makes the remarkable claim that Intervenors have no reasonable expectation of privacy in their prescription records whatsoever. This is both startling and wrong. The confidentiality of medical records and doctor-patient communications has been a central feature of medical practice from well before the nation's founding to the present, and society has long relied on strict limits on their disclosure. Precisely because prescription records can reveal some of the most sensitive and closely held information about a person, there is a reasonable expectation of privacy in them.

The DEA's challenge to Intervenors' standing is similarly unavailing. In the Ninth Circuit, intervenors need not demonstrate independent Article III standing as long as the original plaintiff—here, the State of Oregon—has standing and the entry of intervenors does not eliminate the case or controversy already in existence. Those conditions obtain here. Even if Intervenors did need to demonstrate standing, however, they would have no trouble doing so. The DEA's policy and practice of using administrative subpoenas to request confidential prescription records from the PDMP, which contains Intervenors' prescription records, has

1 – INTERVENORS' COMBINED RESPONSE AND REPLY BRIEF

already caused injury to Intervenors, and additional injury is imminent. This case raises issues at

the core of the Fourth Amendment, implicating law enforcement's ability to peer into the most

private and sensitive details of a person's life. To deny standing to Intervenors would be to

wholly immunize the DEA from Fourth Amendment challenges in all but the smallest number of

cases. This case is properly before the Court, and the DEA cannot avoid scrutiny of its practices.

**ARGUMENT**

I.     **The DEA Has Violated Intervenors' Reasonable Expectation of Privacy in their
       Prescription Records**

   A.  **Intervenors Have a Reasonable Expectation of Privacy in Their Records in the
       PDMP**

The DEA fails to respond meaningfully to Intervenors' claim that the DEA is violating

their reasonable expectation of privacy under the Fourth Amendment. Instead of arguing that

Intervenors have no reasonable expectation of privacy under the *Fourth* Amendment, the DEA

explains why Intervenors do not have an absolute right to informational privacy under the

*Fourteenth* Amendment. Def's Br. 17–21, ECF No. 43. But Intervenors have never argued as

much, and the DEA attempts to imbue the Fourteenth Amendment cases with a significance they

cannot bear.

In their opening brief, Intervenors explained that "[a] reasonable expectation of privacy is

'one that has a source outside of the Fourth Amendment, either by reference to concepts of real

or personal property law or to understandings that are recognized and permitted by society.'"

Intervenors' Br. 11–12 (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (some internal

quotation marks omitted)). Factors relevant to determining which privacy expectations society

accepts as reasonable include, but are not limited to, "'the intention of the Framers of the Fourth

Amendment, the uses to which the individual has put a location, and our societal understanding

that certain areas deserve the most scrupulous protection from government invasion." *Id.* at 13

2 – INTERVENORS' COMBINED RESPONSE AND REPLY BRIEF

(quoting *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (plurality opinion) (some internal quotation marks omitted)). Intervenors identified a number of sources for society's understanding that the expectation of privacy in prescription records and the medical information they reveal is reasonable: case law decided under both the Fourth and Fourteenth Amendments; longstanding rules of medical ethics that were known to (and relied on by) the Framers of the Fourth Amendment and that continue in force today; state laws protecting the privacy of medical information and prescription records; and judicial and societal recognition that certain information about patients revealed by their prescription records—such as information about sexuality, mental health, and substance abuse—is particularly sensitive and deserving of heightened protection. *Id.* at 13–29.

The DEA offers no response to most of Intervenors' arguments, focusing solely on Intervenors' citation of *Whalen v. Roe*, 429 U.S. 589 (1977), and its progeny, which discuss the right to informational privacy in medical information under the Fourteenth Amendment Due Process Clause. *See* Def's Br. 17–22. The DEA correctly observes that neither *Whalen* nor the courts of appeals cases that followed it establish an *absolute* right to informational privacy. *See, e.g.*, *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004). But Intervenors have not cited them for that proposition, nor do they rely on the balancing test announced in these cases for their Fourth Amendment claim. Rather, Intervenors cite the informational privacy cases simply as one source (among many) indicating that society believes people have a privacy interest in their medical information. Intervenors' Br. 15–18. The cases "speak to the widespread acceptance, and thus the reasonableness, of privacy protections for medical records." *Id.* at 15.

The rights to privacy under the Fourth and Fourteenth Amendments are not coextensive, and the tests under the two standards are not the same. In Due Process Clause cases, courts first

ask whether a person has a privacy interest in the information at issue, and then look to whether

the government's need for access to the information outweighs the person's recognized privacy

interest in it.[1] *See Tucson Woman's Clinic*, 379 F.3d at 551. It is the predicate question in Due

Process Clause cases—whether there is a privacy interest in prescription records and medical

information—that is relevant here, as it informs the determination under the Fourth Amendment

of whether society is prepared to recognize the expectation of privacy in prescription records as

reasonable. The fact that some cases have concluded that the conditional right to informational

privacy is outweighed by other governmental or societal interests says nothing about whether the

Fourth Amendment applies. *See State v. Skinner*, 10 So. 3d 1212, 1218 (La. 2009) ("[W]e hold a

warrant is required to conduct an investigatory search of medical and/or prescription records. We

are not prepared to extend *Whalen*, which balanced the individual's privacy interest against the

state's reasonable exercise of its regulatory power, to . . . [uphold] warrantless searches and

seizures of [state] citizens' medical and pharmacy records for criminal investigative purposes.").

Indeed, courts have looked to the privacy interests recognized by the Fourteenth Amendment

cases as support for their holdings on the Fourth Amendment question. *See Ferguson v. City of

Charleston*, 532 U.S. 67, 78 & n.14 (2001) (citing *Whalen*, 429 U.S. at 599–600, in Fourth

Amendment case in support of finding that patients have a reasonable expectation of privacy in

certain medical records); *Douglas v. Dobbs*, 419 F.3d 1097, 1101–03 (10th Cir. 2005) (looking

to right-to-privacy cases decided under the Due Process Clause to assess whether there is a

legitimate expectation of privacy in medical records under the Fourth Amendment).

---

[1] The question in Fourth Amendment cases is whether there is a reasonable expectation of
privacy in the location or item to be searched, such that a warrant is required, or whether in the
absence of a reasonable expectation of privacy a lesser showing by law enforcement will suffice.
*See Kyllo v. United States*, 533 U.S. 27, 32–33, 40 (2001).

4 – INTERVENORS' COMBINED RESPONSE AND REPLY BRIEF

The DEA also misstates the holding of the central case it cites. It contends that the Supreme Court in *Whalen* held there to be "no constitutional right of privacy to prescription information." Def's Br. 21; *see also id.* at 17. The Court did not so hold, but rather concluded that, given the privacy protections written into the challenged state law, the collection of prescription information under the law did not violate the Fourteenth Amendment. The Ninth Circuit has recognized *Whalen* as supporting the conclusion that "[i]ndividuals have a constitutionally protected interest in avoiding 'disclosure of personal matters,' including medical information," *Tucson Woman's Clinic*, 379 F.3d at 551, even if the Court has not yet delimited the bounds of that right, *Seaton v. Mayberg*, 610 F.3d 530, 536–37 (9th Cir. 2010).

Moreover, *Whalen* concerned disclosure of prescription records to a state prescription monitoring program, not requests for such records by law enforcement. 429 U.S. at 604 n.32. *Whalen* might have controlled the ultimate question in this case if Intervenors were suing the State of Oregon over its establishment and operation of the PDMP, but it does not foreclose Intervenors' Fourth Amendment claim against the DEA for warrantlessly searching PDMP records during criminal investigations. Indeed, in *Whalen* the Court disposed of the plaintiffs' Fourth Amendment claim by simply observing that the state's actions did not involve the "affirmative, unannounced, narrowly focused intrusions into individual privacy during the course of criminal investigations" that would trigger the protections of the Fourth Amendment. *Id.* Here, Intervenors challenge precisely the DEA's "affirmative, unannounced, narrowly focused intrusions into individual privacy during the course of criminal investigations," making the Fourth Amendment directly relevant in this case.

The DEA draws a distinction between "medical records" and "medical information," suggesting that even if records are protected under the Constitution, information is not. Def's Br.

18. It is not clear why the DEA considers this distinction helpful, as this case concerns searches of *records* of Intervenors' prescriptions. That the PDMP is made up of digital files does not make its contents any less "records" than were it made up of paper documents in a locked filing cabinet; if anything, the opportunities for abuse are even greater. *See United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010) (en banc) (per curiam) (setting guidelines for searches of electronic data and noting that, as compared to seizures and searches of paper records, the seizure of electronic records "calls for greater vigilance on the part of judicial officers in striking the right balance between the government's interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures").

Lastly, the DEA attempts to distinguish *Tucson Woman's Clinic* on the basis that it concerned records relating to the constitutionally protected provision of abortions. That was one factor in the court's Fourth Amendment analysis. 379 F.3d at 550. The other factor was that "all provision of medical services in private physicians' offices carries with it a high expectation of privacy for both physician and patient." *Id.* That reasoning applies with equal force here.

The DEA offers little to undermine Intervenors' reasonable expectation of privacy, does not refute Intervenors' expert declarations, and provides no declarations or other evidence of its own. What it does offer touches only tangentially on Intervenors' actual argument. Intervenors' prescription records are entitled to the full protection of the Fourth Amendment.

### B.  Where There is a Reasonable Expectation of Privacy, a Warrant is Required

Having failed to demonstrate that Intervenors lack a reasonable expectation of privacy in their prescription records (or even to address most of Intervenors' arguments on this point), the DEA next states that no showing of probable cause is needed for the DEA to issue administrative subpoenas because administrative subpoenas, by their very nature, require no probable cause. Def's Br. 22–24. This is pure tautology. True, when issuance of an administrative subpoena is

proper, it does not require probable cause or prior judicial authorization. *United States v. Golden Valley Electric Ass'n*, 689 F.3d 1108, 1115–16 (9th Cir. 2012). But where, as here, there is a reasonable expectation of privacy in the item or location to be searched, the Fourth Amendment requires a warrant issued by a neutral magistrate upon probable cause. Intervenors' Br. 10–11; *see also, e.g.*, *Katz v. United States*, 389 U.S. 347, 360–61 (1967) (Harlan, J., concurring) (a search of an area where "a person has a constitutionally protected reasonable expectation of privacy" is "presumptively unreasonable in the absence of a search warrant"). This case hinges on Intervenors' reasonable expectation of privacy in their prescription records held by the PDMP. Because Intervenors have demonstrated that they do have a reasonable expectation of privacy in those records, Intervenors' Br. 12–29, a warrant is required unless the government can demonstrate that an exception to the warrant requirement, such as exigency or consent, applies. In sum, Intervenors do not contend that administrative subpoenas as a general matter require probable cause, but that here the DEA's subpoenas violate the Fourth Amendment because warrants are required instead. The DEA's academic summary of how administrative subpoenas function does nothing to refute this point.

### C.  The "Third Party Doctrine" Does Not Apply to Intervenors' Records

Finally, the DEA summarily argues that Intervenors have no reasonable expectation of privacy in their prescription records because those records are in the possession of a third party, the PDMP.[2] Def's Br. 24–25. Intervenors' opening brief explains why the so-called "third party doctrine" does not control the outcome of this case. Intervenors' Br. 29–33. The DEA analogizes

---

[2] The DEA also contends that because Intervenors' prescription records are in the possession of the PDMP, Intervenors have no standing to challenge the DEA's subpoenas to the PDMP. Def's Br. 25. The Supreme Court has made clear, however, that the concept of "standing" under the Fourth Amendment is "more properly subsumed under substantive Fourth Amendment doctrine." *Rakas v. Illinois*, 439 U.S. 128, 139 (1978). The operative question is whether Intervenors have a reasonable expectation of privacy. If so, their challenge to the warrantless issuance of the subpoenas succeeds.

Intervenors' prescription records to "motel registration records, bank records, or electricity records," and argues that the Ninth Circuit has foreclosed the possibility that people could have a reasonable expectation of privacy in any information held by a third party. Def's Br. 24 (citing *Golden Valley Electric Ass'n*, 689 F.3d at 1116). But in *Golden Valley* the Ninth Circuit recognized that records that are "more inherently personal or private than . . . bank records" could receive greater protection under the Fourth Amendment. 689 F.3d at 1116. By way of example, the court pointed to "Google search queries," distinguishable by their "personal nature." *Id.*

If anything could be said to contain "inherently personal" and "private" information—more private than bank records, and more private even than search queries entered into Google—it is the sort of medical records at issue here. Intervenors' prescriptions for schedule II–IV drugs reveal their underlying medical conditions, the course and progress of their treatment, and the decisions reached in confidence with their treating physicians. *See* Intervenors' Br. 12. Much of the information is potentially embarrassing and stigmatizing, and all is deeply private. Indeed, as explained by Intervenors' expert declarants, maintenance of the confidentiality of patient-doctor communications, including prescription information, is integral to the successful practice of medicine itself. *E.g.*, Rothstein Decl. ¶¶ 4–8, ECF No. 30.

Moreover, courts have found in a number of contexts that people can retain a reasonable expectation of privacy in information or locations despite third parties having limited access to them. The Sixth Circuit's opinion in *United States v. Warshak*, 631 F.3d 266 (2010), is instructive. There, the court held that there is a reasonable expectation of privacy in the contents of emails held in an email provider's servers. The court explained that the fact that email is sent through an internet service provider's servers does not vitiate the legitimate interest in email

privacy: both letters and phone calls are sent via third parties (the postal service and phone companies), but people retain a reasonable expectation of privacy in those forms of communication. *Id.* at 285 (citing *Katz*, 389 U.S. at 353; *United States v. Jacobsen*, 466 U.S. 109, 114 (1984)). *Warshak* further held that even if a company has a right to access information in certain circumstances under the terms of service (such as to scan emails for viruses or spam), that does not necessarily eliminate the customer's reasonable expectation of privacy vis-à-vis the government. *Id.* at 286–88. In a variety of contexts under the Fourth Amendment, access to a protected area for one limited purpose does not render that area suddenly unprotected from government searches. *See, e.g.*, *Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990) (holding that "an overnight guest has a legitimate expectation of privacy in his host's home" even though "he and his possessions will not be disturbed by anyone *but his host and those his host allows inside*" (emphasis added)); *Stoner v. California,* 376 U.S. 483, 487–90 (1964) (implicit consent to janitorial personnel to enter motel room does not amount to consent for police to search room); *Chapman v. United States,* 365 U.S. 610, 616–17 (1961) (search of a house invaded tenant's Fourth Amendment rights even though landlord had authority to enter house for some purposes).

Prescription records stored in the PDMP are much like emails stored in an email provider's servers. For one, the entity maintaining the digital files may access them only for limited enumerated purposes. *Compare Warshak*, 631 F.3d at 287 (noting that the email provider's terms of service permitted it to "'access and use individual Subscriber information in the operation of the Service and as necessary to protect the Service'"), *with* Or. Rev. Stat. § 431.966(2)(a)(B) ("[T]he Oregon Health Authority shall disclose the information [in the PDMP] . . . [t]o designated representatives of the authority . . . to establish or maintain the electronic system of the prescription monitoring program."). More importantly, both sets of records are

deeply private. *Compare Warshak*, 631 F.3d at 284 ("[T]he conglomeration of stored messages that comprises an email account . . . provides an account of its owner's life. By obtaining access to someone's email, government agents gain the ability to peer deeply into his activities."), *with Doe v. Se. Pa. Transp. Auth.*, 72 F.3d 1133, 1138 (3d Cir. 1995) ("It is now possible from looking at an individual's prescription records to determine that person's illnesses, or even to ascertain such private facts as whether a woman is attempting to conceive a child through the use of fertility drugs.").

Searching massive computerized files raises particular concerns. *See Comprehensive Drug Testing, Inc.*, 621 F.3d at 1175–77. Prior to creation of the PDMP, individuals could rely on the practical realities of law enforcement's limited resources to protect them from sweeping, dragnet searches: to obtain records of all of a person's prescriptions, in many cases law enforcement would have had to canvass numerous pharmacies or physicians seeking relevant records, a resource-intensive exercise that would have been justified only in important or well-founded cases. Now, however, the government can obtain an entire transcript of a person's out-patient prescription history for scheduled drugs with a single request to the PDMP. This raises especially serious questions under the Fourth Amendment. *Cf. United States v. Jones*, 132 S. Ct. 945, 963–64 (2012) (Alito, J., concurring in judgment) ("In the pre-computer age, the greatest protections of privacy were neither constitutional nor statutory, but practical. . . . Only an investigation of unusual importance could have justified such an expenditure of law enforcement resources. Devices like the one used in the present case, however, make long-term monitoring relatively easy and cheap."). Thus, for these reasons and as explained in Intervenors' opening brief, the so-called "third party doctrine" does not preclude relief here.

II.    **Article III Erects No Barrier to Justiciability of This Case**

A.  **Intervenors Need Not Demonstrate Independent Article III Standing**

The DEA argues that Intervenors lack standing. Def's Br. 6–16. Although Intervenors have demonstrated ample injury to establish Article III standing in their own right, *see infra* Part II.B, the Court need not even conduct a standing analysis because in cases where the original plaintiff has standing, intervenors do not need to demonstrate independent Article III standing to press their claims.

The Ninth Circuit has repeatedly explained that "[a] party seeking to intervene pursuant to Rule 24, Federal Rules of Civil Procedure, need not possess the standing necessary to initiate the lawsuit." *United States v. Imperial Irrigation Dist.*, 559 F.2d 509, 521 (9th Cir. 1977), *rev'd in part, vacated in part on other grounds sub nom. Bryant v. Yellen*, 447 U.S. 352 (1980). Otherwise stated, "[i]n order for an individual to intervene in ongoing litigation between other parties, he need only meet the *Sagebrush Rebellion* [intervention] criteria." *Yniguez v. Arizona*, 939 F.2d 727, 731 (9th Cir. 1991) (citing *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (9th Cir. 1983), for the four criteria required for intervention under Rule 24(a): "(1) timeliness; (2) an interest in the subject matter of the litigation; (3) absent intervention the party's interest may be practically impaired; (4) other parties inadequately represent the intervenor").

The fact that *Yniguez* was subsequently vacated, *see Arizonans for Official English v. Arizona*, 520 U.S. 43, 48–49 (1997), has generated some confusion, leading one panel of the Ninth Circuit to comment that the court has "not definitively ruled on the issue" of "whether an intervenor-applicant must independently establish Article III standing to intervene as of right." *Prete v. Bradbury*, 438 F.3d 949, 955 n.8 (9th Cir. 2006); *see also Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 950, n.2 (9th Cir. 2009). But the statement in *Yniguez* is far from the

only time the Ninth Circuit has held that intervenors do not need to demonstrate standing; both before and after the opinion in *Prete*, the court has opined that "an applicant for intervention need not establish Article III standing to intervene." *Perry v. Schwarzenegger*, 630 F.3d 898, 906 (9th Cir. 2011) (per curiam); *accord Flores v. Arizona*, 516 F.3d 1140, 1165 (9th Cir. 2008), *rev'd on other grounds sub nom. Horne v. Flores*, 557 U.S. 433 (2009); *Cal. Dep't of Soc. Servs. v. Thompson*, 321 F.3d 835, 846 n.9 (9th Cir. 2003); *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1340 (9th Cir. 1992); *Portland Audubon Soc'y v. Hodel*, 866 F.2d 302, 308 n.1 (9th Cir. 1989), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). Indeed, the Supreme Court has itself observed that the Ninth Circuit "resolv[es] intervention questions without reference to standing doctrine." *Diamond v. Charles*, 476 U.S. 54, 68 n.21 (1986).

The Ninth Circuit's approach is consistent with the majority of circuits to address the question. Those courts have clarified that "a party seeking to intervene need not demonstrate that he has standing in addition to meeting the requirements of Rule 24 as long as there exists a justiciable case and controversy between the parties already in the lawsuit. *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989). As the Fifth Circuit has explained, "[o]nce a valid Article III case-or-controversy is present, the court's jurisdiction vests. The presence of additional parties, although they alone could independently not satisfy Article III's requirements, does not of itself destroy jurisdiction already established." *Ruiz v. Estelle*, 161 F.3d 814, 832 (5th Cir. 1998). Thus, "parties seeking to intervene under Rule 24(a) or (b) need not establish Article III standing so long as another party with constitutional standing on the same side as the intervenor remains in the case. In that circumstance the federal court has a Case or Controversy before it regardless of the standing of the intervenor." *San Juan Cnty., Utah v. United States*, 503

F.3d 1163, 1172 (10th Cir. 2007) (en banc) (citation and internal quotation marks omitted).

*Accord Purnell v. City of Akron*, 925 F.2d 941, 948 (6th Cir. 1991); *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 190 (2d Cir. 1978).[3]

The Supreme Court's jurisprudence is consistent with this view. Although the Court has not squarely decided "whether a party seeking to intervene before a District Court must satisfy not only the requirements of Rule 24(a)(2), but also the requirements of Art. III," *Diamond*, 476 U.S. at 68–69, it has permitted intervention by parties who would not have had standing to sue independently. In *Trbovich v. United Mine Workers of America*, 404 U.S. 528 (1972), for example, the Court permitted intervention by a party who would have been barred by statute from initiating the suit in the first instance. *Id.* at 529–30. The lower courts had held that because the statute divested the plaintiff-intervenor of standing to bring suit, it also precluded intervention. *Hodgson v. United Mine Workers of America*, 51 F.R.D. 270, 272 (D.D.C. 1970), *aff'd,* Civ No. 662-70, 1971 WL 2965 (D.C. Cir. Apr. 27, 1971). The Supreme Court reversed, holding that the plaintiff-intervenor could intervene under Rule 24(a), notwithstanding the lack of standing to bring suit independently. *Trbovich*, 404 U.S. at 536–39. The Court has acted analogously in other cases. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 233 (2003); *Arizonans for Official English*, 520 U.S. at 66.

Thus, even if Intervenors could not demonstrate standing—which, as discussed below, they can—their participation in this case would still be proper. It is undisputed that Oregon has standing to sue the DEA, and thus a justiciable case or controversy is before this Court. Intervenors' participation does not eliminate the case or controversy already in existence between the original parties, nor does it divest the Court of jurisdiction. *See Ruiz*, 161 F.3d at

---

[3] *But see Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996); *Bldg. & Constr. Trades Dep't, AFL-CIO v. Reich*, 40 F.3d 1275, 1282 (D.C. Cir. 1994).

832; *Chiles*, 865 F.2d at 1213. Moreover, it is immaterial that Intervenors advance legal arguments distinct from Oregon's—alleging a violation of the Fourth Amendment rather than of Oregon state law. Like the State of Oregon, Intervenors seek a declaration that the DEA's use of administrative subpoenas to obtain confidential prescription records from the PDMP is illegal. That they present an alternative legal theory for that relief does not prevent them from intervening. *Ruiz*, 161 F.3d at 833. Rather, the fact that Intervenors advance their own interests under a distinct legal theory *strengthens* their claim for intervention under Rule 24(a). *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001) (requiring that "the applicant's interest must not be adequately represented by the existing parties in the lawsuit"). This Court has properly granted the motion to intervene based on the Ninth Circuit's intervention factors, and Intervenors need not now demonstrate standing independently. *See Portland Audubon Soc'y*, 866 F.2d at 308 n.1.

### B.  Intervenors Have Article III Standing

Even if Intervenors were required to demonstrate standing, they would have no trouble doing so. To satisfy the standing requirements of Article III, plaintiffs must establish that (1) they have suffered a "concrete and particularized" injury that is "actual or imminent" rather than "conjectural" or "hypothetical"; (2) there is a causal connection between their injury and the challenged statute or conduct, such that the injury is "fairly traceable" to the defendant's alleged violation; and (3) their injury would "likely" be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury is imminent either if it is "certainly impending" or if there is a "'substantial risk' that the harm will occur." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148, 1150 n.5 (2013). The court need only satisfy itself that one plaintiff has standing, not that all plaintiffs do. *Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

Application of these requirements is not a "mechanical exercise," *Allen v. Wright*, 468 U.S. 737, 751 (1984), and is properly guided by the underlying purposes of the standing doctrine. "At bottom, 'the gist of the question of standing' is whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentations of issues upon which the court so largely depends for illumination'" *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Here, Intervenors suffer both present and impending injuries as a result of the DEA's warrantless requests for confidential prescription records from the PDMP. Those injuries create an Article III case or controversy and provide the Court with jurisdiction over Intervenors' claims.

### 1.   Intervenors are suffering actual present injuries that are fairly traceable to the DEA's use of administrative subpoenas under 21 U.S.C. § 876

Intervenors satisfy the injury-in-fact requirement of standing because they are suffering actual and ongoing injury as a result of the DEA's use of administrative subpoenas to request and obtain confidential prescription records from the PDMP.

The DEA's warrantless requests for confidential prescription records and its actual receipt of such records from the electronic database in which Intervenors' confidential prescription records are kept violates Intervenors' reasonable expectations of privacy and thus injures them. Intervenors have therefore "allege[d] a concrete claim of invasion of a personal constitutional right— . . . the Fourth Amendment right to be free from unreasonable searches and seizures." *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 908–09 (9th Cir. 2011). They have thus suffered a cognizable injury. *Id.* This case is analogous to *Jewel*. There, the plaintiffs—current and former subscribers to AT&T's phone and internet services—alleged that the government was warrantlessly intercepting electronic communications and phone calls that passed through a particular AT&T facility, in violation of the Fourth Amendment. The court held that the

allegation that plaintiffs' communications passed through the AT&T facility in question and that the government was intercepting, without a warrant, communications passing through that same facility was sufficient to establish standing. *Id.* at 908–11.

Here, similarly, Intervenors have demonstrated that their prescription records are contained in the PDMP and that the DEA is issuing warrantless requests to the PDMP for prescription records, at least one of which has been enforced. Intervenors John Does 1–4 each have current prescriptions for schedule II, III, or IV medications that they fill in Oregon pharmacies. Doe 1 Decl. ¶¶ 4–6, ECF No. 33; Doe 2 Decl. ¶¶ 4–5, ECF No. 34; Doe 3 Decl. ¶¶ 4–5, ECF No. 35; Doe 4 Decl. ¶¶ 4–5, ECF No. 36. Therefore, information about their prescriptions, including their names and dates of birth, their prescribing doctors' names, the schedule II–IV medications they take, and the quantity of medications dispensed, are recorded in the PDMP.[4] *Id.* John Doe 4 has actually requested and received a copy of his prescription history report from the PDMP, which further demonstrates that the PDMP contains a record of his prescriptions for schedule II–IV drugs. Doe 4 Decl. ¶ 5. Dr. James Roe provides prescriptions for schedule II–IV medications to patients in Oregon, many of which are filled in Oregon pharmacies. Roe Decl. ¶¶ 6–15, ECF No. 37. Information about those prescriptions is therefore recorded in the PDMP. *Id.* ¶ 16.

The DEA has obtained at least one set of confidential prescription records from the PDMP pursuant to an administrative subpoena issued under 21 U.S.C. § 876. *See* Intervenors' Br. 7. The subpoena sought records of six months of prescriptions written by one doctor, including the names, birth dates, and prescription information for each patient who received

---

[4] Effective January 1, 2014, additional information about patients and their prescriptions will be reported to the PDMP, including patients' sex, the "number of days for which the prescription drug was dispensed," and the "number of refills of the prescription authorized by the practitioner and the number of the refill that the pharmacy dispensed." 2013 Or. Laws, ch. 550, § 3.

prescriptions for schedule II–IV drugs from the doctor. *See id.* The DEA has issued and served additional subpoenas on the PDMP, and has stated that it will issue approximately two subpoenas to the PDMP per month for the foreseeable future. *See id.*

Intervenors need not prove that the DEA has actually requested or obtained their records via a § 876 subpoena, nor could they. Because the DEA does not provide notice to individuals whose prescription records are sought or obtained via subpoena, individuals would only have proof that their records had been unconstitutionally obtained in the rare case where the DEA requested and received records from the PDMP, indicted the patient or doctor described in those records, and then introduced the records as evidence at trial. (If the Doe intervenors' records are obtained through a subpoena to the PDMP for their physicians' prescription records, they will *never* receive notice, even if the physician is prosecuted). Plaintiffs need not wait for that confluence of events. *See United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.* ("*Keith*"), 407 U.S. 297, 317–18 (1972) ("The independent check upon executive discretion is not satisfied, as the Government argues, by 'extremely limited' post-surveillance judicial review. Indeed, post-surveillance review would never reach the surveillances which failed to result in prosecutions." (footnote omitted)). The DEA's undisputed current and ongoing warrantless requests to the database containing Intervenors' confidential medical records inflicts an injury by commandeering the PDMP for its own purposes, ignoring the warrant requirement imposed by Oregon law and the Fourth Amendment, and subjecting Intervenors' confidential prescription records to a policy and practice of unconstitutional searches.

Further, Intervenor Dr. James Roe reasonably believes that the DEA has issued an administrative subpoena to the PDMP seeking some or all of his prescription records contained in the system. Dr. Roe has been investigated by the DEA for his prescribing practices, including

being asked about prescriptions for schedule II–IV drugs written for individual patients. Roe
Decl. ¶¶ 25–30. Although the investigating agents refused to disclose whether they had requested
or obtained records from the Washington or Oregon prescription drug monitoring programs, Dr.
Roe believes that they requested records from both. *Id.* ¶¶ 31–34. This is not mere speculation:
The DEA has stated under oath that,

> [u]ltimately, it is required that a DEA investigation targeting criminal diversion of
> pharmaceutical controlled substances determine whether the issuance, receipt or
> fulfillment of a physician's prescription is conducted in accordance with
> applicable laws. *The Oregon Prescription Monitoring Program (PMP) is the only
> resource available to the DEA where information addressing each of these three
> actions is consolidated.*

Declaration of Lori A. Cassity In Support of Petition to Enforce DEA Administrative Subpoena ¶
4, *U.S. v. Oregon PDMP*, No. 12-MC-298 (D. Or. Aug. 24, 2012), Wessler Decl. Ex. JJ, ECF
No. 29-1 (emphasis added); *accord* Def's Br. 4. In light of the DEA's acknowledgment that it
views requests to the PDMP to be an indispensable part of drug diversion investigations, it is not
only reasonable to believe, but is likely that the agency requested Dr. Roe's records from the
PDMP during its investigation of his prescribing practices. Such probabilistic injuries have been
recognized by the courts. *See Massachusetts v. EPA*, 549 U.S. at 525 n.23.

As a result of the DEA's investigation of him, including his belief that the DEA has
requested or obtained records of his prescriptions from the PDMP, Dr. Roe has suffered injuries.
He has changed his prescribing practices, stopped making house calls to patients, and required
patients who are discharged from inpatient facilities and require pain medications classified in
schedules II–IV to find another doctor to issue those prescriptions within one week of discharge.
Roe Decl. ¶ 36. As a result, Dr. Roe has lost income, *id.*, which undoubtedly constitutes an injury
in fact. *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996)
("Economic injury is clearly a sufficient basis for standing."). The DEA's issuance of subpoenas

18 – INTERVENORS' COMBINED RESPONSE AND REPLY BRIEF

has also interfered with the confidentiality of Dr. Roe's relationship with his patients, thus

harming his practice of medicine. *See* Rothstein Decl. ¶¶ 4–8.

Further, the harms suffered by Dr. Roe are fairly traceable to the DEA's use of 21 U.S.C.

§ 876 to issue and serve administrative subpoenas on the PDMP. Dr. Roe's injuries stem in part

from his reasonable belief that the DEA has requested his prescription records from the PDMP.

That his injuries are also caused in part by the DEA's other investigatory tactics does not

eliminate the causation required for standing. If an agency's action contributes to the plaintiff's

injury, even incrementally, that is sufficient to establish causation for standing purposes.

*Massachusetts v. EPA*, 549 U.S. at 523–24; *see also Maya v. Centex Corp.*, 658 F.3d 1060, 1070

(9th Cir. 2011) (holding that plaintiffs need not "demonstrate that defendants' actions are the

'proximate cause' of plaintiffs' injuries," but only that there is "a 'line of causation' between

defendants' action and their alleged harm that is more than 'attenuated'" and is "plausible"

(citations and brackets omitted)).

### 2.   Intervenors face a substantial risk of impending injury from the DEA's use of administrative subpoenas under 21 U.S.C. § 876

The DEA argues that Intervenors lack standing because their "claims rest on a series of

speculative contingencies" like the "attenuated chain of possibilities" rejected in *Clapper v.*

*Amnesty International USA*, 133 S. Ct. at 1148. Def's Br. 11–12. That is not so. Even if

Intervenors could not demonstrate present injury from the DEA's actions, they have shown a

"'substantial risk' that the harm will occur," *Clapper*, 133 S. Ct. at 1150 n.5, and that injury is

"certainly impending," *id.* at 1148. Contrary to the DEA's position, the Supreme Court's

standing jurisprudence does "not uniformly require plaintiffs to demonstrate that it is literally

certain that the harms they identify will come about." *Id.* at 1150 n.5.

"The 'Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements.'" *Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 761 (9th Cir. 2004). It has, for example, found standing due to a "substantial risk" of injury, *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2754–55 (2010), "a sufficient threat of actual injury," *Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988), and "a realistic danger of sustaining direct injury as a result of [a] statute's operation or enforcement," *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). The Ninth Circuit has likewise repeatedly held that "'a concrete *risk* of harm to the [plaintiffs] . . . is sufficient for injury in fact.'" *Harris*, 366 F.3d at 761 (alterations in original); *see also Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142 (9th Cir. 2010).[5]

Here, Intervenors have established that if the DEA is permitted to continue obtaining confidential prescription records from the PDMP without a warrant, there is a substantial risk that their prescription records will be sought and obtained in violation of the Fourth Amendment. Indeed, that harm is impending, contingent only on the outcome of proceedings in this case; a ruling for the DEA would begin the flow of subpoenas and ensure that Oregon honors them. The DEA has already obtained PDMP records without a warrant at least once, has attempted to do so a number of times, and has stated that it will continue regularly serving § 876 subpoenas on the PDMP in order to procure confidential prescription records "for the foreseeable future." *See* Intervenors' Br. 7. Intervenors have ongoing prescriptions for controlled substances that are among the most scrutinized by law enforcement, including narcotic painkillers, Doe 1 Decl. ¶¶ 8–13; Doe 3 Decl. ¶¶ 9–13, steroids, Doe 2 Decl. ¶¶ 8–13; Doe 4 Decl. ¶¶ 8–11, and

_____

[5] Of particular relevance here, the risk of future injury has supplied standing in numerous Fourth Amendment cases. *See, e.g.*, *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822 (2002); *Chandler v. Miller*, 520 U.S. 305 (1997); *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602 (1989).

benzodiazepine-class anti-anxiety medication, Doe 3 Decl. ¶¶ 15–17. The Doe intervenors

justified fear that the DEA will investigate them using subpoenas to the PDMP because of their

repeated filling of prescriptions for these medications. *E.g.*, Doe 2 Decl. ¶ 19; Doe 4 Decl. ¶ 16.

In addition, the DEA may obtain Intervenors' prescription records pursuant to warrantless

requests to the PDMP for records of prescriptions written by their physicians. Although

Intervenors cannot say with absolute certainty that the DEA will issue subpoenas for their

confidential prescription records, they have demonstrated that there is a substantial risk that the

DEA will do so. A probability of injury short of absolute certitude can be sufficient to confer

standing. *See Monsanto Co.*, 130 S. Ct. at 2754–55 (upholding lower court's finding that

plaintiffs faced a "reasonable probability" of harm); *Massachusetts v. EPA*, 549 U.S. at 525 n.23

(quoting *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993), as holding that

"even a small probability of injury is sufficient to create a case or controversy—to take a suit out

of the category of the hypothetical"). Because Doe intervenors habitually use schedule II–IV

drugs in Oregon, their prescriptions are required to be logged in the PDMP, and the DEA views

subpoenas to the PDMP to be an indispensable tool in drug diversion investigations, *see supra*

Part II.B.1, there is a substantial and realistic danger that John Does 1–4's prescription records

will be subject to a DEA subpoena.[6]

  Moreover, the Doe intervenors have identified more particularized reasons why they face

a substantial risk of injury. John Doe 3, for example, has taken Vicodin, which contains

hydrocodone, for years and expects to continue taking it for the rest of his life. Doe 3 Decl. ¶¶ 6–

13. Far from the typical Vicodin user, who uses the medication to treat a discrete, time-limited

---

[6] The DEA incorrectly construes Intervenors to allege a risk of harm from potential disclosure of
their confidential prescription records to the public. Def's Br. 5, 9. Although that would cause
harm, the injuries that provide standing to Intervenors flow from the DEA's warrantless requests
for confidential prescription records from the PDMP in violation of the Fourth Amendment.

ailment,[7] Doe 3 must use it for treatment of all aches and pains that in others are treated with

nonscheduled over-the-counter medications. He is therefore more likely to come to the attention

of law enforcement than other users of that and similar drugs. John Does 2 and 4, likewise,

expect to continue taking testosterone for the rest of their lives. Doe 2 Decl. ¶ 10; Doe 4 Decl. ¶

10. They believe their habitual use of a schedule III steroid and the particular pattern of their use

is likely to trigger law enforcement scrutiny. Doe 2 Decl. ¶¶ 10, 19; Doe 4 Decl. ¶ 16.

  Intervenor Roe likewise faces a substantial risk that the DEA will request his prescription

records from the PDMP. Assuming, arguendo, that the DEA has not yet requested Dr. Roe's

records from the PDMP, the agency's ongoing investigation of his prescription practices creates

a substantial risk that it will imminently do so. The DEA has stated that "[t]he Oregon

Prescription Monitoring Program (PMP) is the only resource available to the DEA where

information addressing [the issuance, receipt or fulfillment of a physician's prescription] is

consolidated." Cassity Decl. ¶ 4, Wessler Decl. Ex. JJ. Given the agency's sustained

investigation of Dr. Roe, *see* Roe Decl. ¶¶ 25–39, it is highly likely that it will soon request his

records from the PDMP.

  Further, the substantial risk that the DEA will use § 876 subpoenas to obtain Intervenors'

confidential prescription records is causing and will cause Intervenors to suffer concrete injuries.

The DEA's warrantless access to PDMP records, and the possibility that the DEA will obtain

Intervenors' records without probable cause, causes Intervenors "mental distress," "anxiety,"

---

[7] *See* Memorandum from Silvia Calderon, Team Leader Pharmacology, Controlled Substance
Staff, Food & Drug Admin., to Douglas Throckmorton, Deputy Dir., Ctr. for Drug Evaluation &
Research, Food & Drug Admin. 16 (Oct. 2, 2012), *available at*
http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/Drug
SafetyandRiskManagementAdvisoryCommittee/UCM325708.pdf ("[C]ombination
hydrocodone-containing analgesics . . . are used to treat acute pain, whereas the single-ingredient
opioid analgesics appear to be used more for treatment of chronic pain.").

"distress[]," and "upset[]." Doe 1 Decl. ¶ 26; Doe 2 Decl. ¶ 21; Doe 3 Decl. ¶ 26; Doe 4 Decl. ¶ 18. Intervenor John Doe 3 states that the DEA's warrantless access to confidential prescription records in the PDMP would exacerbate his anxiety disorder and could increase his need for anxiety medication. Doe 3 Decl. ¶ 26. Information regarding John Doe 2's testosterone dosage reveals the status of his transition from female to male sex, including whether he has had his ovaries surgically removed. Doe 2 Decl. ¶¶ 13, 20–21. Having that information revealed to law enforcement without probable cause will cause dignitary harm and particularized distress. *Id.* An allegation that defendant's actions cause a plaintiff "generalized anxiety and stress" is sufficient injury to establish standing. *Krottner*, 628 F.3d at 1142 (citing *Doe v. Chao*, 540 U.S. 614, 617–18, 624–25 (2004), as "suggesting that a plaintiff who allegedly 'was "torn . . . all to pieces" and "was greatly concerned and worried" because of the disclosure of his Social Security number and its potentially "devastating" consequences' had no cause of action under the Privacy Act, but nonetheless had standing under Article III" (ellipsis in original)).

Intervenors will also suffer financial harm as a result of taking reasonable measures to protect their privacy from warrantless intrusion by the DEA. Intervenor John Doe 3 would take steps to protect his privacy, including possibly filling his prescriptions in another state, which would impose additional costs on him and be inconvenient. Doe 3 Decl. ¶ 27. John Doe 2 would attempt to protect his privacy by requesting that he receive smaller but more frequent supplies of testosterone from the pharmacy in order to avoid creating unjustified suspicion based on his receipt of large, 20-week supplies. Doe 2 Decl. ¶ 21. This would impose the expense and inconvenience of making more frequent trips to the pharmacy. John Doe 1 would discuss with his physician whether he had alternative treatment options that would not result in prescription records being placed in the PDMP. Doe 1 Decl. ¶ 27. As discussed above, Dr. Roe has already

suffered financial harm. *Supra* Part II.B.1. Expenditure of funds constitutes a clear injury in fact, and standing exists where a "'substantial risk' that the harm will occur" causes "plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 133 S. Ct. 1150 n.5; *see also Maya*, 658 F.3d at 1069 ("Allegedly, plaintiffs spent money that, absent defendants' actions, they would not have spent. This is a quintessential injury-in-fact." (citation omitted)).[8] Because those injuries will occur in the event that the DEA is permitted by this Court to obtain PDMP records without a warrant, they satisfy the requirements of Article III.

Notwithstanding the live controversy between Intervenors and the DEA based on the impending risk of warrantless searches of Intervenors' confidential prescription records, the DEA argues that *Clapper* precludes a finding of standing. Def's Br. 11–13. However, the outcome of *Clapper* was dependent on the facts of that case, holding that at least five contingent events would have to occur, in sequence, for plaintiffs' alleged injury to be consummated. No such attenuated chain exists here. As characterized by the Court, the *Clapper* plaintiffs' argument for standing

> rest[ed] on their highly speculative fear that: (1) the Government will decide to
> target the communications of non-U.S. persons with whom they communicate; (2)
> in doing so, the Government will choose to invoke its authority under § 1881a

---

[8] Even a *de minimus* financial or pecuniary injury is enough to satisfy the injury-in-fact requirement. As explained by the Ninth Circuit, the Supreme Court has

> allowed important interests to be vindicated by plaintiffs with no more at stake in
> the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50
> poll tax . . . . "The basic idea that comes out in numerous cases is that an
> identifiable trifle is enough to fight out a question of principle; the trifle is the
> basis for standing and the principle provides the motivation."

*Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). Injury also exists where "the extent of [a plaintiff's] economic harm is not readily determinable," but the plaintiff will "likely" suffer "*some amount* of pecuniary harm." *Cent. Arizona Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1538 (9th Cir. 1993).

rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.

133 S. Ct. at 1148.[9] Here, Intervenors' risk of injury shares none of these speculative leaps. First, while the communications of the *Clapper* plaintiffs were not directly targetable under the challenged statute,[10] here the DEA clearly has authority to directly target Intervenors' prescription records. *See* 21 U.S.C. § 876(a) (authorizing issuance of subpoena for any records relevant or material to a controlled substances investigation). Second, unlike surveillance of international communications, there are not multiple legislative schemes authorizing the warrantless search and seizure of prescription records from the PDMP. As a DEA official explained in her declaration in support of the petition to enforce the DEA's January 2012 subpoena, the DEA believes that it has no alternative but to request PDMP records in drug diversion investigations because "[t]he Oregon Prescription Monitoring Program (PMP) is the only resource available to the DEA where information addressing [fraudulent issuance, receipt, and fulfillment of a prescription] is consolidated." Cassity Decl. ¶ 4, Wessler Decl. Ex. JJ. Short of a warrant, § 876 is the only means of legal process the DEA can rely on to secure prescription records contained in the PDMP. Third, unlike surveillance under the Foreign Intelligence

_____

[9] After the Court decided *Clapper*, major news outlets published a series of stories revealing that "vast amounts" of Americans' international communications were, in fact, being swept up by the NSA's surveillance programs. *See, e.g.*, Charlie Savage, *N.S.A. Said to Search Content of Messages To and From U.S.*, N.Y. Times, Aug. 8, 2013, http://www.nytimes.com/2013/08/08/us/broader-sifting-of-data-abroad-is-seen-by-nsa.html.
[10] Plaintiffs in *Clapper* were "United States persons," and therefore could not be directly targeted under the statute. 133 S. Ct. at 1142 (citing 50 U.S.C. § 1881a). Plaintiffs feared that individuals outside the United States with whom they communicated as part of their work were "likely targets of surveillance under § 1881a," and thus that their communications with those individuals would be swept in by the government's statutorily authorized surveillance activities. *Id.*

Surveillance Act, the DEA is not currently required to obtain prior judicial authorization for a §
876 subpoena; rather it issues the subpoenas sua sponte. 21 U.S.C. § 876. And fourth, there is no
question whether the DEA will "succeed" in obtaining records from the PDMP. None of the
difficulties inherent in interception of international communications exist here: It is uncontested
that Intervenors' records are stored in the PDMP, and that the PDMP will produce them to the
DEA pursuant to proper legal process (pending the outcome of this case).

    The DEA attempts to insert links into the causal chain where there are none. Trying to
downplay the likelihood that Intervenors' prescription records in the PDMP would be subject to
a §876 subpoena, the DEA asserts that its "requests [to the PDMP] are not focused on all drugs
prescribed by the target doctor or pharmacy," but rather only "'certain'" drugs. Def's Br. 8–9
(quoting Memorandum in Support of Petition to Enforce DEA Administrative Subpoena at 5,
*U.S. v. Oregon PDMP*, No. 12-MC-298 (D. Or. Aug. 24, 2012)). Thus, the DEA asserts, "for the
Does to have a cognizable harm, this Court would have to assume that . . . the investigation will
concern the specific prescription drug(s) being used by the Doe." *Id.* at 10.

    This is a mischaracterization of the DEA's subpoena practices. The example subpoena to
which the DEA refers (from January 2012) requested a list of "*all* Schedule II-V controlled
substance prescriptions written [by Dr. . . .] from 06/01/2011 through 01/06/2012." Declaration
of Tyler D. Warner in Support of Petition to Enforce DEA Administrative Subpoena ¶ 3, *U.S. v.
Oregon PDMP*, No. 12-MC-298 (D. Or. Aug. 24, 2012), Wessler Decl. Ex. LL (emphasis added)
(alteration in original). Far from seeking only records of "certain" or "specific" prescriptions, the
subpoena sought a set of records about the target doctor's prescriptions coextensive with what

the PDMP contained.[11] Thus, a request for PDMP records of a particular physician's or patient's

prescriptions would return information about *every* prescription for any schedule II–IV drug

issued by the doctor or filled by the patient in Oregon. The DEA's searches of confidential

medical records in the PDMP are limited only by the breadth of records logged there.[12]

 The DEA also asserts that "[PDMP] data is used as an investigative tool when the DEA is

investigating a specific physician or pharmacy for illegal distribution of controlled substances,"

Def's Br. at 8, thus implying that a subpoena could not or would not seek a particular patient's

prescription records from the PDMP. *See also id.* at 10. That implication is not supported in the

record. The example subpoena from January 2012 does seek records of prescriptions issued by a

specific doctor, but the DEA cites no record evidence or other authority establishing that

subpoenas are not also issued for specific patients' records as well. In fact, the DEA has

previously acknowledged that its requests for records in the PDMP are used to investigate

prescriptions that are "fraudulently obtained by a patient," in addition to those "unlawfully issued

by a physician or filled by a pharmacy." Cassity Decl. ¶ 4, Wessler Decl. Ex. JJ; *accord* Def's

Br. 3–4. Information about individual patients' prescriptions for schedule II–IV drugs is plainly

---

[11] Actually, the subpoena sought records beyond what the PDMP contained, since the PDMP does not log prescriptions for schedule V drugs.

[12] It is certainly plausible that in an investigation the DEA could expect to focus on only certain drugs when reviewing records returned by the PDMP. However, a warrantless request for confidential prescription records violates the Fourth Amendment and causes injury whether or not the DEA finds incriminating information in the PDMP records, just as a thermal imaging scan of a home constitutes a search even if the scan does not reveal that the homeowner is growing marijuana. *See Kyllo v. United States*, 533 U.S. 27 (2001). The Fourth Amendment violation and the injury flowing from it result from the warrantless collection of PDMP records, independent of their usefulness to a DEA investigation. *Cf. United States v. Rabinowitz*, 339 U.S. 56, 80 (1950) (Frankfurter, J., dissenting) ("The main aim of the Fourth Amendment is against invasion of the right of privacy . . . without regard to the result of such invasion.").

contained in the PDMP, and there is nothing to stop the DEA from requesting a patient's records or, for that matter, initiating a prosecution based on them.[13]

### 3. Dr. Roe has standing to advance the Fourth Amendment rights of his patients

Dr. Roe also has standing to represent the Fourth Amendment interests of his patients with prescription records in the PDMP. *See* Compl. in Intervention ¶ 12, ECF No. 18. Approximately half of Dr. Roe's patients are in Oregon, and many of those patients fill prescriptions for schedule II–IV drugs written by Dr. Roe at Oregon pharmacies, thus generating reports to the PDMP. Roe Decl. ¶¶ 6–16. If those patients' confidential records have not already been requested from the PDMP without a warrant pursuant to the DEA's current investigation of Dr. Roe and his patients, they face a substantial risk that the DEA will request them soon.

The Supreme Court has set out a two-part test for parties to sue on behalf of others not before the court: "first, has the litigant suffered some injury-in-fact, adequate to satisfy Article III's case-or-controversy requirement; and second, do prudential considerations which we have identified in our prior cases point to permitting the litigant to advance the claim?" *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989). As demonstrated above, *supra* Part II.B.1–2, Dr. Roe has suffered an injury in fact adequate to satisfy the requirements of Article III. Therefore, the first prong of the test is satisfied.

---

[13] *Cf. United States v. Ilayayev*, 800 F. Supp. 2d 417, 423–24 (E.D.N.Y. 2011) (federal prosecution of patient investigated by DEA for obtaining simultaneous oxycodone prescriptions from multiple doctors due to drug addiction); *Tucker v. City of Florence, Ala.*, 765 F. Supp. 2d 1320, 1328 (N.D. Ala. 2011) (agent with county drug task force requested from the Alabama Prescription Drug Monitoring Program "records of all prescriptions for controlled substances that [a specific patient] had filled between January 1, 2006 and November 30, 2007"); *United States v. George*, No. 1:09cr431 (JCC), 2010 WL 1740814, at *2 (E.D. Va. Apr. 26, 2010) (federal prosecution of patient for reselling controlled substance pills obtained through "doctor shopping," based partly on records from Virginia Prescription Monitoring Program).

To answer the second question—the prudential one—the Court has "looked at three

factors: the relationship of the litigant to the person whose rights are being asserted; the ability of

the person to advance his own rights; and the impact of the litigation on third-party interests." *Id.*

As recognized in numerous cases, the doctor-patient relationship satisfies the first factor. *See,*

*e.g.*, *Singleton v. Wulff,* 428 U.S. 106, 117 (1976); *Griswold v. Connecticut*, 381 U.S. 479, 481

(1965); *Compassion in Dying v. Washington*, 79 F.3d 790, 795 (9th Cir. 1996), *rev'd on other*

*grounds sub nom. Washington v. Glucksberg*, 521 U.S. 702 (1997). More particularly, courts

have recognized physicians' standing to assert the Fourth Amendment rights of their patients. *In*

*re Search Warrant,* 810 F.2d 67, 71 (3d Cir. 1987); *Sterner v. U.S. Drug Enforcement Agency*,

467 F. Supp. 2d 1017, 1026 (S.D. Cal. 2006); *In re Subpoenas Duces Tecum*, 51 F. Supp. 2d 726,

738 & n.6 (W.D. Va. 1999), *aff'd* 228 F.3d 341 (4th Cir. 2000); *cf. Pagano v. Oroville Hosp.,*

145 F.R.D. 683, 696 (E.D. Cal. 1993) ("Physicians, as custodians of their patients' medical

records, also have the duty to assert the privacy rights of their patients.").

Here "[t]he closeness of the relationship [between Dr. Roe and his patients] is patent."

*Singleton*, 428 U.S. at 117. Because the prescription records at issue reveal confidential

information at the core of the doctor-patient relationship between Dr. Roe and his patients—and

because the DEA's use of § 876 threatens to interrupt that relationship—"the relationship

between the litigant and the third party [is] such that the former is fully, or very nearly, as

effective a proponent of the right as the latter." *Id.* at 115; *see also Fair Employment Council of*

*Greater Wash., Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1280–81 (D.C. Cir. 1994) ("[T]he

Court has allowed litigants to assert third parties' rights in challenging restrictions that do *not*

operate directly on the litigants themselves, but that nonetheless allegedly disrupt a special

relationship—protected by the rights in question—between the litigants and the third parties.").

29 – INTERVENORS' COMBINED RESPONSE AND REPLY BRIEF

On the second factor, obstacles to bringing suit facing the person whose rights are being asserted need not be "insurmountable." *Singleton*, 428 U.S. at 117. Even, for example, if a suit could have been brought pseudonymously or as a class, the existence of deterrents to bringing suit will weigh in favor of allowing *jus tertii* standing. *Id.* Here, the stigma associated with receiving prescriptions for narcotic painkillers and anti-anxiety-disorder medications, among other scheduled drugs, presents a deterrent to patients who may wish to assert their Fourth Amendment rights. *See id.* ("[The patient] may be chilled from such assertion [of her own rights] by a desire to protect the very privacy of her [abortion] decision from the publicity of a court suit."). Additionally, many of Dr. Roe's patients suffer from terminal illnesses and are in the last months of their lives. Roe Decl. ¶¶ 7, 11–12. Those patients are hardly in a position to devote the time and energy to litigation over their Fourth Amendment rights while contending with their illnesses, and once deceased they have no ability to do so at all. *Cf. Singleton*, 428 U.S. at 117 ("imminent mootness" of an individual's claim can be an obstacle to bringing suit on her own behalf). Moreover, Dr. Roe's patients will receive no notice of a subpoena served on the PDMP that seeks their prescription records, making it unlikely that they would raise their own Fourth Amendment claim. *See United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 574 (3d Cir. 1980) ("As a practical matter, the absence of any notice . . . of the subpoena means that no person other than [the petitioner] would be likely to raise the privacy claim. Indeed, this claim may be effectively lost if we do not hear it now.").

The third prudential factor, impact of the litigation on third-party interests, also weighs in favor of standing.[14] This case will establish whether the Fourth Amendment prohibits the DEA from warrantlessly obtaining confidential prescription records from the PDMP. A determination

---

[14] This factor is often dispensed with. *See Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1127 (9th Cir. 2004).

that no warrant is required would "materially impair" the privacy rights of Dr. Roe's patients by subjecting their records to search by subpoena. *Craig v. Boren*, 429 U.S. 190, 196 (1976).

Because Dr. Roe "can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal," there is no bar to his *jus tertii* standing in this case. *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1127 (9th Cir. 2004) (quoting *Sec'y of State v. Joseph H. Munson Co.,* 467 U.S. 947, 956 (1984)).

*    *    *

To deny standing to Intervenors would be to wholly immunize the DEA from Fourth Amendment challenges in all but the smallest number of cases. If Intervenors are not permitted to bring suit here, the only circumstances in which individuals with confidential prescription records in the PDMP could challenge the DEA's warrantless access to those records would be if the DEA issues and serves a subpoena for those records, indicts the person to whom the records pertain, prosecutes them, and either discloses the records pursuant to the government's *Brady* obligations or introduces the evidence at trial.[15]

Whether denial of standing will insulate a surveillance program from judicial review is an important factor in the standing calculus: In *Clapper*, the Supreme Court recently supported its ruling that the plaintiffs lacked standing to challenge surveillance under § 702 of the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1881a, by explaining that the holding "by no means insulates [the law] from judicial review." 133 S. Ct. at 1154. Because surveillance under the statute could only be carried out pursuant to an order from the Foreign Intelligence Surveillance Court, the government's surveillance practices would necessarily be reviewed by a court. *Id.*

---

[15] Troublingly, the DEA's compliance with *Brady* has recently been called into question. *See* John Shiffman & Kristina Cooke, *Exclusive: U.S. Directs Agents to Cover Up Program Used to Investigate Americans*, Reuters (Aug. 5, 2013), http://reut.rs/15xWJwH.

Further, the Court explained, under the statute "if the Government intends to use or disclose information obtained or derived from a § 1881a acquisition in judicial or administrative proceedings, it must provide advance notice of its intent, and the affected person may challenge the lawfulness of the acquisition." *Id.* Neither of those safeguards exists here: § 876 subpoenas are issued without court order or review, and the statute includes no notice requirement for individuals whose records the DEA obtains. In order to ensure that the DEA's use of § 876 subpoenas complies with the Fourth Amendment and ceases to violate Intervenors' and other Oregon patients' rights, this Court should proceed to the merits of the case.

### C.  Intervenors' Claims are Ripe

While standing doctrine ensures that the correct parties are before the court, *see Massachusetts v. EPA*, 549 U.S. at 517, ripeness is a "question of timing" intended to avoid "premature adjudication." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 1999) (en banc) (internal quotation marks omitted). Both doctrines are rooted in Article III's case-or-controversy requirement, and their elements overlap. Contrary to the DEA's claims, this case is ripe for adjudication by this Court.

There are two components to ripeness, constitutional and prudential. *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). "The constitutional component of ripeness overlaps with the 'injury in fact' analysis for Article III standing." *Id.* As detailed above, *supra* Part II.B, Intervenors have suffered an injury in fact making "the issues presented . . . 'definite and concrete, not hypothetical and abstract,'" and therefore ripe. *Wolfson*, 616 F.3d at 1058.

The case also satisfies the two requirements of prudential ripeness: (1) the issue presented—the constitutionality of the DEA's administrative subpoenas to the PDMP—is "fit[] . . . for judicial decision," and (2) withholding decision on that issue at this time would cause "hardship to the parties" by subjecting them to violations of their Fourth Amendment rights and

causing them to expend resources to avoid harm. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).

In arguing that this case is "speculative" and "premature," Def's Br. 7, 12, the DEA obscures the undisputed details of what has already occurred here. The DEA has already served at least three § 876 subpoenas on the PDMP and has gotten one judicially enforced by a federal magistrate judge. That subpoena sought "all Schedule II-V controlled substance prescriptions" written by a doctor over a six-month period, thus sweeping in a large amount of confidential information about the doctor-patient relationship and private facts about patients' health. Warner Decl. ¶ 3, Wessler Decl. Ex. LL. The DEA has refused to alter its policy of seeking records from the PDMP using administrative subpoenas, rejecting Oregon's requests that it obtain warrants as required by Oregon law (and the Fourth Amendment). The agency has stated under oath that it intends to continue sending multiple administrative subpoenas to the PDMP each month for the foreseeable future. The result is that the DEA has violated, and will continue to violate, the Fourth Amendment rights of Intervenors and other Oregon residents.

These facts show that the case is fit for judicial decision because "[t]he issue presented in this case is purely legal, and will not be clarified by further factual development." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985); *see also Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1434–35 (9th Cir. 1996) (holding that purely legal issue as to constitutionality of licensing scheme is ripe for decision even where plaintiff had not yet applied for a license). The conduct by the DEA that Intervenors challenge has already occurred and continues, and the controversy before this Court is concrete: the DEA takes the position that there is nothing improper with its administrative subpoenas to the PDMP, or with its policy and practice of issuing such subpoenas, and Oregon and Intervenors contend that the subpoenas are

not permissible under the Fourth Amendment (Intervenors) and Oregon law (Oregon).
Intervenors have already suffered injury and face a substantial risk of further injury from the
DEA's practices. *See Truth v. Kent Sch. Dist.*, 542 F.3d 634, 643 (9th Cir. 2008) (a challenge is
ripe where plaintiff "complains of discrete events that have already occurred"), *overruled on
other grounds by L.A. Cnty. v. Humphries*, 131 S. Ct. 447 (2010). Moreover, the law is clear that
"one does not have to await the consummation of threatened injury to obtain preventative relief."
*Babbitt*, 442 U.S. at 298  (internal quotation marks omitted).

      Intervenors also establish the second consideration of prudential ripeness because
withholding decision in this case would cause "hardship to the parties." *Wolfson v. Brammer*,
616 F.3d at 1060. The only thing currently preventing the DEA from obtaining large amounts of
confidential medical information from the PDMP is Oregon's refusal to comply with the DEA's
subpoenas during the pendency of this litigation. Should this Court dismiss Intervenors' claims
for lack of ripeness, the State of Oregon has conceded that § 876 preempts the state law
requirement of probable cause, Oregon's Br. 8, ECF No. 25, and the DEA will be able to obtain
Intervenors' and other Oregon patients records without probable cause, in violation of the Fourth
Amendment. At its base, Intervenors' hardship stems from the DEA's hijacking of the PDMP for
its own purposes. When the PDMP was created, Oregon residents, including Intervenors,
accepted the mandatory reporting of confidential prescription records in part because of the
warrant requirement imposed by Or. Rev. Stat. 431.966(2)(a)(C) and guaranteed by the Fourth
Amendment. *See* Intervenors Br. 22–23. The DEA now claims a right to all of the benefits of the
PDMP—its use in furtherance of criminal investigations—without observing the limits imposed
by state law and the federal Constitution. The Fourth Amendment violation wrought by the
DEA's policy and practice creates a hardship for Intervenors and other Oregon residents, as

amply described above. *See supra* Part II.B. Hardship to the parties is clearly found in the same economic and psychological injuries that support standing. *Id*.

The case is ripe for review, and there is no bar to the justiciability of Intervenors' claims.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs-Intervenors' motion for summary judgment and deny Defendant DEA's cross-motion for summary judgment.

Dated: September 23, 2013             Respectfully submitted,

/s/ Nathan Freed Wessler
_____
Nathan F. Wessler (*pro hac vice*)
Ben Wizner (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
Fax: (212) 549-2654

/s/ Kevin Díaz
_____
Kevin Díaz (OSB No. 970480)
ACLU Foundation of Oregon
PO Box 40585
Portland, OR 97240
Tel.: (503) 227-6928
Fax: (503) 227-6948

*Counsel for Plaintiffs-Intervenors*