1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF OREGON

3 OREGON PRESCRIPTION DRUG      )
  MONITORING PROGRAM, an agency )
4 of the STATE OF OREGON,       )
                           )
5         Plaintiff,     ) No. 3:12-cv-02023-HA
                           )
6     vs.               ) January 15, 2014
                           )
7 UNITED STATES DRUG ENFORCEMENT ) Portland, Oregon
  ADMINISTRATION, an agency of  )
8 the UNITED STATES DEPARTMENT   )
  OF JUSTICE,              )
9                           )
         Defendant.      )
10 ------------------------------

11

12

13

14

15

16               **MOTION HEARING**

17         TRANSCRIPT OF PROCEEDINGS

18     BEFORE THE HONORABLE ANCER L. HAGGERTY

19      UNITED STATES DISTRICT COURT JUDGE

20

21

22

23

24

25

1                           APPEARANCES

2    FOR THE PLAINTIFF:    Sheila H. Potter
                          Oregon Department of Justice
3                          Special Litigation Unit
                          1515 S. W. Fifth Avenue
4                          Suite 410
                          Portland, OR  97201
5
                          Sarah M. Villanueva
6                          Oregon Department of Justice
                          1162 Court Street, NE
7                          Salem, OR  97301-4096

8    FOR THE DEFENDANT:    Kevin C. Danielson
                          Assistant United States Attorney
9                          U.S. Attorney's Office
                          1000 S. W. Third Avenue
10                         Suite 600
                          Portland, OR  97204
11
     FOR THE INTERVENORS:  Nathan F. Wessler
12                         Ben Wizner
                          Kevin Diaz
13                         American Civil Liberties Union
                          Foundation
14                         125 Broad Street
                          18th Floor
15                         New York, NY  10004

16   COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
                          United States District Courthouse
17                         1000 S. W. Third Avenue, Room 301
                          Portland, OR  97204
18                         (503) 326-8186

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2              THE COURT:  You can be seated.

3              This is the time set for summary judgment

4    arguments in Oregon Prescription Drug.  Yesterday the

5    Court sent out an e-mail with some questions that I

6    thought would aid in getting to the points the Court

7    would like additional information on.

8              So with that, I'd like to start with Question

9    No. 1, and we can have the State's attorney proceed in

10   that fashion.

11             Is it going to be Ms. Potter?

12             MS. POTTER:  Yes, it will, Your Honor.  Thank

13   you.

14             THE COURT:  Okay.

15             MS. POTTER:  And would you prefer me to stand or

16   sit?  I think the mics catch it better when I sit, but

17   I'm happy to stand as well.

18             THE COURT:  Actually, since we have no jury, I

19   don't care if all counsel remain seated.

20             MS. POTTER:  Thank you, Your Honor.  And thank

21   you for sending out the questions yesterday.  It was --

22   it was nice to have a chance to think about them and do

23   some research on some issues that the State hadn't

24   previously addressed.

25             Looking at the case law that I found since

1   yesterday, essentially where we've arrived at is that I

2   don't -- I don't find case law that compels a decision

3   either that the Fourth Amendment prevents the use of

4   administrative subpoenas or that the Fourth Amendment

5   allows administrative subpoenas.

6           The cases that talk about Fourth Amendment cases

7   are pretty limited to restrictions on administrative

8   subpoenas that are only going after documents.  There are

9   a number of cases to that effect, including from the U.S.

10  Supreme Court, but none of those cases get into the

11  question of what happens when those subpoenas are going

12  after documents that are entitled to privacy protections.

13          And I think certainly prescription records can be

14  extraordinarily private, and that's why the State has put

15  such careful protections on their collection and their

16  retention by the State, because they are immensely

17  private; and the ACLU has articulated some of the reasons

18  why they can be so terribly private.

19          And at the same time I don't find cases

20  suggesting that medical records, when they have passed

21  through a doctor and then to a pharmacist and then from

22  the pharmacist to the State, which has in its statutes

23  limitations on the extent to which it will hold them --

24  there are provisions for when the State can release them,

25  including the one that's at issue in our Complaint -- I

1    don't find cases suggesting that the Fourth Amendment is

2    an absolute bar to the DEA using an administrative

3    subpoena for certain records.

4         And I think ultimately what the Fourth Amendment

5    requires is a case-by-case analysis of the specific

6    records that are sought, the extent to which they are

7    intruding into privacy, the scope of the records.

8         I found some cases that support that.  Neither of

9    them are controlling in Oregon.  There's one from the

10   Western District of Virginia and one from the Southern

11   District of New York, and I've got copies for counsel and

12   for the Court (handing).

13        And those cases, each of these cases suggests

14   that there is -- The question under the Fourth Amendment

15   is whether the disclosure sought is reasonable.  And on

16   page 11 of the Virginia case, which is *In re Subpoenas*

17   *Duces Tecum Nos. A99-001 through 004* -- and that's

18   51 F.Supp.2d 726 -- on page 11 of the printout, the

19   Western District of Virginia said that the Fourth

20   Amendment protects against only unreasonable searches and

21   seizures and that the Court should consider the need for

22   the materials, the movant's expectation of privacy of the

23   materials, the breadth of the request, the time period

24   discovered -- or the time period covered, excuse me, the

25   particularity with which the materials are described, and

1   the burden imposed by compliance.  And it cites *U.S. v.*

2   *International Business Machines* in support of that, which

3   is a Southern District of New York case, which says

4   essentially the same thing.

5           And I -- what that suggests to me is that in

6   the -- with respect to an administrative subpoena, it

7   does need to be a fact-specific, case-by-case inquiry as

8   to whether there are Fourth Amendment protections

9   applicable to the records.  If there is a search for

10  records relating to whether a physician is prescribing

11  startling amounts of pseudoephedrine to a whole lot of

12  patients who have the same last name, there may not be

13  the same expectation of privacy for those records as

14  there would be for records that would be looking at

15  something like the hormones that would be related to

16  transgender treatment.

17          So that supports the State's position that when

18  the state Prescription Drug Monitoring Program receives

19  these subpoenas, what we really need is a judge to look

20  at it and assess, is this an appropriate scope for the

21  subpoenas?  Does it fall within the appropriate scope?  I

22  do think that the Fourth Amendment analysis is

23  appropriate here.  And the extent to which that analysis

24  extends to limit the scope is going to depend on the

25  records sought.

1          THE COURT:  Okay.

2          MS. POTTER:  Does that answer your question?

3          THE COURT:  Mr. Danielson?

4          MR. DANIELSON:  Your Honor, the Fourth Amendment

5    does not preclude the use of an administrative subpoena.

6    I mean, people have a -- in fact, in *Whalen v. Roe*, which

7    is a very similar case, decided in, I think, 1977, where

8    New York started this database of collecting prescription

9    information, the Supreme Court said there is a liberty

10   interest, but it is not a Fourth Amendment liberty

11   interest, and they specifically found that.

12          And so relying on the Supreme Court holding, the

13   Fourth Amendment does not protect -- absolutely protect

14   medical records.  In the Ninth Circuit case, *Tucson*

15   *Woman's Clinic*, it set up a five-part test to determine

16   the privacy interest in medical records.  But it did not

17   say that there's a Fourth Amendment right to medical

18   records.

19          And the five-part test is met in this case, as

20   we've explained in the briefs, Your Honor.  It has to do

21   with the type of information that's released, the

22   potential for harm, the safeguards, and if there's

23   explicit statutory authority allowing the kind of

24   material to be released.

25          Here, Congress decided in the Controlled

1    Substances Act to give the administrative subpoena power

2    to the DEA to investigate information that is relevant

3    and material if they think something wrong is going on.

4    So our position is there is no Fourth Amendment right to

5    have all medical information protected, but there is a

6    privacy interest based on a balancing test.

7              THE COURT:  Okay.  Is it Mr. Wessler?

8              MR. WESSLER:  Yes.  Good morning, Your Honor.

9              THE COURT:  Good morning.

10             MR. WESSLER:  I'd like to briefly address the

11   points that Mr. Daniels just made, and then I'd like to

12   turn back to what I think is the central concern

13   animating this first question.

14             *Whalen* and *Tucson Woman's Clinic* and all of these

15   other cases decided under the due process clauses, the

16   Fourteenth and Fifth Amendment rights to informational

17   privacy, have something to say relevant to the Fourth

18   Amendment inquiry in this case, but the ultimate

19   conclusion of those cases is completely irrelevant to the

20   ultimate question under the Fourth Amendment.

21             Those cases apply a balancing test to determine

22   whether the government's collection of information

23   violates the right to informational privacy, and it

24   balances the privacy interest in the information against

25   the protections put in place by the government against

1  further dissemination or unintended access to that

2  information.

3         Under the Fourth Amendment, the question is

4  whether there is a reasonable expectation of privacy in

5  an item or location.  When there is a reasonable

6  expectation of privacy, the warrant requirement applies

7  unless one of the narrowly circumscribed exceptions to

8  the warrant requirement, like exigency, applies; and

9  those exceptions are not at issue here.

10         So in those Fourteenth Amendment cases, Courts

11  have recognized that there is a privacy interest in

12  medical records.  In other circuits -- the Tenth Circuit,

13  for example, specifically explained that there is a

14  privacy interest in prescription records.  And then they

15  go on to this balancing test.  And in *Whalen*, that

16  involved looking at the protections the State of New York

17  had against further dissemination or -- or theft of the

18  information.

19         If we were challenging the ability of the State

20  of Oregon to collect information in the PDMP, then *Whalen*

21  might well be controlling.  But what we're looking at now

22  are the narrowly focused intrusions on individual privacy

23  during the course of a criminal investigation by law

24  enforcement.  That's what the Fourth Amendment is

25  directed at.  And, in fact, *Whalen* specifically says that

1   it is not engaging in a Fourth Amendment analysis because
2   that kind of intrusion is not at issue.
3          So now turning to what I think this first
4   question is getting at, I think it's helpful to step back
5   and look at first principles a little bit under the
6   Constitution.  And unconstitutional federal law cannot
7   preempt anything.  The supremacy clause is where the
8   preemption doctrine derives from.  And the supremacy
9   clause provides that "This Constitution" -- I'm
10  quoting -- "This Constitution and the laws of the United
11  States, which shall be made in pursuance thereof, shall
12  be the supreme law of the land."
13         In other words, the supremacy clause applies only
14  to those laws made in pursuance of the Constitution, only
15  constitutional laws.  The Supreme Court, I think in a
16  couple of opinions, has spoken to this -- to this
17  question of whether the supremacy clause can enforce a
18  federal statute, a regulation, or a policy on the states
19  when that statute or regulation is unconstitutional.
20         I would respectfully direct the Court to *Printz*
21  *v. United States* -- that was decided in 1997; it's at 521
22  U.S. 898 -- and to *Alden v. Maine*, 527 U.S. 706, decided
23  in 1999.  Both of those cases explain in very clear
24  language that the supremacy clause only applies to
25  enforce a federal law against the states when that law is

1    made in pursuance of the Constitution.

2           *Printz* was about whether provisions of the Brady

3    Act that sought to conscript local law enforcement into

4    enforcing or carrying out some background check

5    provisions could actually be enforceable against those

6    local law enforcement officials.  And the Court clearly

7    stated that it had to look to whether that part of the

8    Brady Act was constitutional before determining whether

9    it -- it had binding effect on those local law

10   enforcement agents.  And the Court found that because

11   those provisions of the Act violated state sovereignty

12   and principles of federalism found throughout the

13   Constitution, it was unconstitutional and therefore could

14   not be binding.

15          So I think that the -- what I take to be the

16   inquiry in this first question is whether this Court may

17   and in fact should assess the constitutionality of the

18   DEA's use and application of Section 876 during or before

19   the preemption inquiry.  And I think the answer to that

20   is yes.

21          The use of that statute in the situation

22   infringes upon a reasonable expectation of privacy that

23   patients and doctors have in their prescription records

24   and in the very confidential medical information that

25   those -- those records reveal, which can reveal

somebody's illnesses, their diagnoses, their physician's
confidential medical advice, their treatment decisions.

That's precisely the kind of information that the
Supreme Court, in *Ferguson*, directed was covered by the
Fourth Amendment and stated that there's a reasonable
expectation of privacy, information like diagnostic test
results.  Here the prescription records can tell just as
much about a person's underlying health as a test result
itself.

And the Supreme Court's decision finds support in
all the principles of medical confidentiality that have
been binding on physicians and recognized by state
evidentiary privileges for centuries, millennia even, in
the particular privacy interest in types of information
like transgender status, HIV/AIDS diagnosis, mental
illness, in the increasing trend of states to protect
this information in their Prescription Drug Monitoring
Programs, and in all the other sources we cite in the
brief.

And I guess my last note would just be that we
take the -- the DEA's briefs in this case to not contest
any of those -- those other sources of the reasonable
expectation of privacy and only to argue about the force
of those Fourteenth Amendment cases.  You know, even
putting those cases completely aside, I think it is quite

1  clear that this information is private and the Fourth
2  Amendment fully applies.
3           THE COURT:  Okay.  Thank you.
4           If we can move on to Question 2, we'll go in the
5  same order again.
6           Ms. Potter.
7           MS. POTTER:  You know, on Question 2, Your Honor,
8  I'm not sure that the State has a particular position on
9  the intervenor's standing.
10          THE COURT:  That's fine.
11          MS. POTTER:  So I'm going to cede my time to the
12  others.
13          THE COURT:  All right.  Mr. Danielson?
14          MR. DANIELSON:  The question deals with the
15  intervenors and standing.  Standing is a fundamental
16  precept of constitutional law, where there must be an
17  actual case in controversy, Your Honor.  The law is clear
18  that for each claim brought by any party, they must have
19  standing.
20          So the fact that they may have a subjective
21  expectation of privacy, I mean, I think the Court could
22  consider that as one of the factors, but nevertheless the
23  Court has to go back and do an objective analysis as to
24  whether they do have standing.  And standing -- the test
25  for standing is clear in the sense that it cannot be a

speculative.  A speculative set of circumstances that
might occur, that might create an injury, that does not
lead to standing.

And so in this case, that's essentially what you
have.  You have four patients who have -- who are taking
drugs that are between Schedules II and IV.  And there
are 7 million prescriptions annually taken into the PDMP
database, 7 million prescriptions.

The intervenors have presented no evidence that
their pharmacies are being investigated, their doctors
are being investigated, that the DEA has any special
interest in any of the drugs they are taking.  So you do
have to look at standing for each of the plaintiffs'
claims.  And they present no evidence except it's
possible the DEA might investigate sometime; we don't
know.

THE COURT:  Mr. Wessler.

MR. WESSLER:  The simple answer to this question
is no.  The concepts of standing under Article III and
under the Fourth Amendment are completely distinct, and
the Supreme Court has made that clear.

Under Article III a federal court has
jurisdiction if there's a case or controversy before it.
Here, at the very least, Oregon's initial complaint
against the DEA creates a case or controversy.  The State

1   is undisputed to have Article III standing here.  And so

2   regardless of whether intervenors are required to

3   demonstrate standing independently -- and I can address

4   that in a moment -- there is a case or controversy that's

5   here properly before the Court.

6         The Supreme Court has explained that what has

7   sometimes been called Fourth Amendment "standing" is

8   actually more property subsumed under the Fourth

9   Amendment analysis.  *Rakas v. Illinois* I think is the

10  case most on point.  It's cited in our brief.  In other

11  words, there's no such thing as, quote, unquote, standing

12  under the Fourth Amendment because that concept is the

13  same and addresses the same questions as whether there is

14  a reasonable expectation of privacy in the item or

15  location to be searched.

16         And if a person has a reasonable expectation of

17  privacy and the Government infringes on that expectation

18  in the course of a search -- a search without a warrant,

19  that is -- then that person has suffered -- has suffered

20  a wrong under the Fourth Amendment and may -- may come

21  into court to address their rights.

22         On the question of whether there is an effect on

23  the intervenors' subjective expectations of privacy, you

24  know, I think looking to the declarations of -- of each

25  of the intervenors, the four patients and Dr. Roe, those

1 declarations explain very clearly that -- that all five
2 of those individuals do have a genuine subjective
3 expectation of privacy in their prescription records in
4 the PDMP, and that expectation has a source in a number
5 of places.

6          I mean, certainly it has a source in the
7 embarrassment and the stigma that can come from
8 disclosure of the very sensitive medical information that
9 these people have, the fact of transgender status or even
10 the stage of a transition from male to female pursuant to
11 medication prescribed by a doctor after a diagnosis of
12 gender identity disorder or gender dysphoria.

13          For John Doe 3, information about his mental
14 illness, which he tries very hard to keep private, his
15 anxiety disorder and his PTSD, it's I think quite
16 understandable that would genuinely be thought to be
17 private by these people.

18          But that subjective expectation also has a source
19 in the general societal expectation that the information
20 patients share with their doctors is protected by all of
21 the rules and norms of medical confidentiality that have
22 been in force for ages; and in this case, I think
23 importantly, a source in the Oregon Legislature's
24 considered and very clear determination that -- that
25 records in the PDMP will be protected against search by

1    law enforcement unless law enforcement obtains a court

2    order based on probable cause.  That was, in my

3    understanding, a "but for" cause of the passage of the

4    legislation in 2009, inclusion of that protection.  And

5    that protection is -- is repeated in multiple places on

6    PDMP's website and its public materials and certainly has

7    helped form the actual expectation of privacy of these

8    and other patients throughout the state of Oregon.

9            To just respond to -- to counsel's discussion of

10   the need to demonstrate Article III standing, this Court

11   has already granted intervenor's motion to intervene by

12   applying the four-factor test that the Ninth Circuit sets

13   out under Rule 24, and that is the only hurdle for

14   intervention in a case like this.

15           The Ninth Circuit set out a very clear bright

16   line rule:  Intervenors need not possess the standing

17   necessary to initiate a lawsuit.  In other words, as long

18   as those criteria under Rule 24 are satisfied and

19   intervenors are joining an existing Article III case or

20   controversy that is properly before the Court, there is

21   no independent standing required.  As our brief explains,

22   the majority of circuits agree with this -- this view.

23           And the fact that the intervenors are -- are most

24   explicitly raising an argument that the State of

25   Oregon -- that's different than the State of Oregon's, an

1  argument that the Fourth Amendment, as opposed to under

2  state law and the preemption clause, has no effect on

3  that bright line rule, it does nothing to destroy the

4  standing of the State of Oregon or to eliminate the case

5  or controversy already here.

6       And I think particularly in light of the

7  discussion we just had about the necessity of assessing

8  the constitutionality of federal action before even

9  getting into the preemption question, there's simply no

10  reason for the Court to -- to even engage in an

11  Article III standing analysis to the intervenors.

12       I'd be very happy later on to address why the

13  doctor and patients here do have Article III standing

14  should the Court decide to reach -- pass the Ninth

15  Circuit's rule into that question, but I think I can

16  leave that until later.

17            THE COURT:  Okay.  Question 3, Ms. Potter?

18            MS. POTTER:  We don't believe it is problematic

19  for the DEA to be forced to use warrants to gain access

20  to the database.

21            THE COURT:  All right.  Mr. Danielson?

22            MR. DANIELSON:  Congress -- Congress gave the DEA

23  the power to investigate the CSA, Your Honor.  And one of

24  the tools it gave Congress was investigative subpoena

25  power.  It wanted to do that.  It decided to do that

because it wanted the agency to be able to rapidly
investigate possible violations of the law.  It did not
want to impose an obstacle to the DEA to investigate, and
it did not want to impose a burden on the courts for
every time the DEA wanted to do something, to have to go
to court to get Court approval based on probable cause.
If Congress wanted to do so, it clearly could have done
so.  It chose not to do so.

THE COURT:  Okay.  Mr. Wessler?

MR. WESSLER:  It is our position that it is not
problematic at all for the DEA to be forced to use
warrants to access the confidential prescription records
in the PDMA.  That's what the Fourth Amendment requires.

And with respect, the DEA's argument here I take
not as an argument but as bootstrapping.  The fact that
Congress has -- has legislated in an area doesn't mean
that the Constitution falls away.  The Fourth Amendment
is the final word on what law enforcement may do in the
course of an investigation when undertaking a search.

Now, to be absolutely clear, the question that
we're raising here is not whether the DEA may obtain
records from the PDMP; it's simply how it may do so.  It
may use -- it must use a warrant instead of an
administrative subpoena.  And that relief we're seeking
we see as really quite modest.

1          To reiterate, under the Fourth Amendment, if

2     there is a reasonable expectation of privacy in an item

3     or location, law enforcement must secure a warrant before

4     conducting a search.  The Supreme Court has stated

5     multiple times that the warrant requirement is not a mere

6     inconvenience to be weighed against law enforcement's

7     demands for efficiency, for example.

8          And, you know, the contention that -- that the

9     DEA doesn't want to have to demonstrate probable cause to

10    obtain this information because it wants to use this

11    information to develop probable cause at a later stage in

12    the investigation is -- it's just circular reasoning that

13    I don't think has anything to say about the effect of the

14    Fourth Amendment here.

15         You know, I'm sure that law enforcement would

16    find it quite useful to -- to enter people's homes and

17    conduct searches on a mere hunch rather than getting a

18    warrant, in order to develop probable cause for an arrest

19    or a later search, but that's not what's allowed.  And

20    law enforcement, as this Court well knows, applies for

21    warrants all the time.  Magistrate judges in this

22    courthouse review applications and grant Rule 41 warrants

23    on a daily basis.

24         You know, when the Oregon Legislature enacted the

25    statute, it thought that law enforcement would be able to

do its job just fine using a warrant.  It heard testimony

from law enforcement, testimony from privacy advocates,

from members of the public, came to that considered view.

As far as I know, law enforcement in the state of Oregon

is able to carry out its duties just fine.  We see

absolutely no reason why the DEA couldn't do so using a

warrant as well.

MR. DANIELSON:  May I respond to that briefly,

Your Honor?

THE COURT:  You may.

MR. DANIELSON:  As the Controlled Substances Act

is right now, the DEA can go to individual -- individual

pharmacies.  They can go to Walgreens, they can go to

Rite-Aids, with an administrative subpoena and get the

same information.  There is no requirement of probable

cause.

The only reason we're here is because the State

of Oregon decided to create a database where all the

information from all the pharmacies in the state is

located.  It makes it an easy way for the DEA to get it.

But otherwise, they could clearly go to these pharmacies,

one by one or chain by chain, and get the information,

clearly without probable cause, just by submitting the

administrative subpoena.  It just makes it easier, more

convenient, and faster for the DEA.

1          MR. WESSLER:  Your Honor, could I make one

2    brief -- brief response to that?

3          When the State of Oregon created this program, it

4    did so with explicit protections on the privacy of the

5    information in it, recognizing that -- that when the

6    State collects this kind of very sensitive information

7    from hundreds and thousands of sources and consolidates

8    it in one location for a public health purpose, to

9    provide doctors a way to -- to check their patients'

10   records and make sure that a patient hasn't been getting

11   prescriptions for a similar drug from another doctor, for

12   example, or to refer them to treatment, the State

13   considered the balances here and put in strict

14   protections on law enforcement access.

15         The fact that the DEA may obtain records from

16   pharmacies as part of a regulatory investigation under

17   the administrative search exception to the warrant

18   requirement I think doesn't say anything about whether

19   patients with records in the PDMP have a reasonable

20   expectation of privacy in those records.

21         Pharmacists understand that their business

22   records may be reviewed in order to make sure that

23   they're complying with the professional and legal

24   obligations on them.  But that -- patients in Oregon have

25   not traded away any of their privacy interests in this

1    information merely by talking to their doctor about their
2    underlying conditions, then bringing a prescription slip
3    to the pharmacist, and taking home their necessary
4    medications.
5            THE COURT:  Okay.  Let's charge the order and
6    take No. 4, first with Mr. Danielson.
7            But going back to the premise you just stated,
8    that the DEA could go directly to the pharmacies, if the
9    pharmacies rejected the administrative subpoena, what
10   would --
11           MR. DANIELSON:  They would take them to court,
12   Your Honor.
13           THE COURT:  They would have to get a court order.
14           MR. DANIELSON:  They would.  But say the DEA --
15   under that same scenario, the Court has the power to hold
16   the person receiving the subpoena in contempt unless they
17   have some good reason not to comply.
18           THE COURT:  Okay.  Step 1 would be DEA goes to
19   the pharmacy.  And then say, hypothetically, that the
20   pharmacy refuses.  You then get a court order,, and it's
21   only then, if the pharmacies refuse --
22           MR. DANIELSON:  Correct.
23           THE COURT:  -- the Court could hold them in
24   contempt.
25           MR. DANIELSON:  I believe so, Your Honor.

1          The subpoena is valid on its face when it's

2     issued.  The person receiving the subpoena is required to

3     comply.  If they refuse, they can go to court.

4          THE COURT:  Well, I'm not certain they're

5     required to comply.

6          But let's go on to No. 4.

7          MR. DANIELSON:  You've asked a factual question,

8     and I can -- I may need to supplement the record if you

9     want a more specific answer, and the DEA would be happy

10    to do so, Your Honor, because the question is "Has the

11    DEA used material gathered through administrative

12    subpoenas to the PDMP to investigate an individual that

13    was later prosecuted?  If so, have those individuals been

14    advised of the fact that administrative subpoenas were

15    used to gather evidence?"

16         In the vast majority of time, the administrative

17    subpoenas are investigative tools used to -- used to

18    investigate.  They are used for administrative

19    proceedings primarily.  They aren't just used to

20    investigate criminal cases.  Usually the only reason the

21    DEA would issue an administrative subpoena is based on

22    information it already has of a possible violation.  If

23    an administrative subpoena is issued and complied with

24    and they examine it and they see that it may lead to a

25    criminal matter, then they would -- then they would

1  follow criminal procedures with either a grand jury

2  subpoena or a search warrant or something more than that.

3          I'm assured by DEA that -- I'm not going to give

4  you a percentage, Your Honor, but the vast majority of

5  the time they are used for administrative proceedings,

6  possibly to revoke somebody's license, whether it's a

7  pharmacy or a doctor.  But they are rarely used for

8  criminal proceedings alone.  I can't say that has never

9  happened, but I can tell that you the vast majority are

10  for administrative proceedings.

11          THE COURT:  Anyone else wish to speak?

12          Ms. Potter?

13          MS. POTTER:  Your Honor, I can advise -- I spoke

14  to my clients.  I don't believe the PDMP has produced any

15  records to the DEA under administrative subpoena only,

16  but we have in response to a court order.

17          MR. WESSLER:  I obviously can't answer the

18  factual question, but I do think that there are a couple

19  of points that bear mentioning, that inform an

20  understanding of the DEA's answer.

21          One is just to keep in mind the breadth of the

22  subpoenas that actually have been issued here.  The three

23  subpoenas that the DEA has sent to the PDMP, one was

24  enforced by a magistrate judge in August of 2012, which

25  sought six months of prescription records for one doctor.

1    A second, on September 11, 2012, sought individual

2    patients' prescription records for a duration of time

3    that's not publicly known.  And the third sought a year's

4    worth of records, prescription records of two different

5    doctors.

6            All three of those subpoenas have prohibited --

7    explicitly on their face prohibit the State of Oregon

8    from informing the subject of those subpoenas of their

9    existence, of informing them that their records have been

10   or are about to be subjected to a warrantless search by

11   the Government.

12           So I think that, to my mind, it's important to

13   know what the DEA's policy would be in at least three

14   situations:  What it would be if it obtained records

15   about a physician or a patient, that those records

16   confirm their suspicions, they indicted that individual,

17   prosecuted them, would notice be given there?  Would

18   notice be given if they were prosecuted, but those

19   prescription records from the PDMP were not actually

20   introduced at trial as evidence?  And would notice be

21   given if the DEA obtained records of patients or doctors,

22   but those records dispelled suspicion rather than

23   confirmed it and the Government chose not to advance to a

24   prosecution?  There there would never even be the

25   constructive notice of seeing the records introduced

against one at trial, and a person would be left totally
at the mercy of a government violation that they had not
received any notice of.

So I think those all speak to the importance of
this Court hearing the case that's properly before it
today and avoiding that kind of a perverse outcome where
only people who are -- only the most guilty, so to speak,
people would have redress for violation of their rights.

THE COURT:  And if we can go to the last
question, again, a change in order.

Mr. Danielson?

MR. DANIELSON:  The question, Your Honor, is does
this Court have authority to make the DEA's Section 876
subpoenas self-enforcing and isn't that what the DEA is
asking this Court to do?

The answer is no, Your Honor, we are not asking
the Court to make a subpoena self-serving.  To repeat
myself, they are valid when issued.  When somebody
refuses, we go to a Court to enforce them.  That's the
provision and procedure that Congress provided for.

THE COURT:  Okay.  Ms. Potter?

MS. POTTER:  Your Honor, yes, the Court -- I
believe the Court does not have the authority to make the
administrative subpoenas self-enforcing.  The case law
that we've cited in our briefs over and over supports

1    that the recipient of an administrative subpoena has the

2    right to challenge the subpoena and go to court and have

3    the judge take a look at it and review it before we just

4    start turning over records.

5            THE COURT:  Mr. Wessler?

6            MR. WESSLER:  We agree with the State's position

7    on this.  At the very least, even if a subpoena is proper

8    as a general matter, by which I mean even if there was no

9    reasonable expectation of privacy in the item or location

10   that it seeks to enter, there's still a reasonableness

11   requirement imposed by the Fourth Amendment.

12           And the Ninth Circuit has explained this multiple

13   times, most recently I think in *Golden Valley*.  But the

14   subpoena can't be too indefinite; it must be reasonably

15   relevant to the underlying investigation; it can't be

16   unduly burdensome or overly broad.  And any time the

17   State has a good faith reason to challenge a subpoena at

18   least on those grounds, it has a right under the Fourth

19   Amendment to do so.

20           And a broad perspective ruling that subpoenas are

21   always reasonable and appropriate under the Fourth

22   Amendment or under the preemption clause based on the

23   statutes, I think would -- would preclude the State from

24   bringing those kinds of constitutionally required

25   challenges.

1         THE COURT:  Okay.  I assume, Ms. Potter, you have

2    some additional information we should put on the record

3    in light of your poster boards.

4         MS. POTTER:  That's correct, Your Honor.

5         THE COURT:  You may proceed.

6         MS. POTTER:  Thank you.

7         And, Your Honor, I will -- I will make that part

8    of the discussion brief.  And it is aimed at some of the

9    things that we've been talking about here, and these are

10   aimed specifically at the preemption question, that the

11   Fourth Amendment certainly places limits on an

12   administrative subpoena; and the extent of those limits,

13   as I said earlier, I think are probably fact specific.  I

14   think that it requires the Court to take a look at what

15   the administrative agency is looking for and the scope

16   and the privacy rights at issue in assessing that.

17        The DEA has taken the position that Section 876,

18   the Controlled Substances Act, just preempts the entire

19   text of subsection (C) of the PDMP's statute, placing

20   protections on these records.  And our position is that

21   rather -- even if the Court were to find that the Fourth

22   Amendment does not have any probable cause requirement

23   when it comes to administrative subpoenas served under

24   the Controlled Substances Act, the only thing that does

25   is this:  It reads the "based on probable cause" out of

1    the statute.

2         The statute itself hangs together just fine

3    without it.  It still requires that the State disclose

4    prescription drug monitoring information, only pursuant

5    to a valid court order issued at the request of a

6    federal, state or local law enforcement agency engaged in

7    an authorized drug-related investigation, involving a

8    person to whom the requested information pertains.

9         Now, that is very similar to exactly the factors

10   that a federal court has to look at anyway when reviewing

11   an administrative subpoena.  It's whether Congress has

12   granted the authority to investigate, whether procedural

13   requirements have been followed, whether the evidence is

14   relevant and material to the investigation.

15        These require essentially the same thing, with

16   the addition of procedural requirements having been

17   followed.  And that question of whether the evidence is

18   relevant and material to the investigation is going to be

19   a fact specific question.

20        The case that -- where Judge Papak issued an

21   order, the DEA submitted briefing showing this

22   information is relevant to the material and the

23   investigation.  Judge Papak reviewed that and determined

24   it was.  That's appropriate.  I think that's what Oregon

25   law requires, because only the probable cause, at most,

1   is preempted by federal law.

2          And the State's position is that the PDMP has a

3   positive legal obligation to hold on to the records until

4   a Court has -- to challenge an administrative subpoena

5   and to hold on to the records until the Court has

6   reviewed the administrative subpoena and either ordered

7   the records as requested or limited the request as the

8   Court may determine appropriate.

9          And, secondarily, as discussed in our briefing,

10  even if the Court were to find that the PDMP does not

11  have a legal obligation under state law to wait for a

12  court order before it discloses these private records, I

13  think that they're not self-enforcing, these

14  administrative subpoenas.  And we would ask for, at a

15  minimum, a ruling that the PDMP has the right to seek --

16  to challenge the administrative subpoena, to ask for a

17  Court to review it, and to wait for that court order

18  before it turns over confidential patient prescription

19  records.

20          THE COURT:  Mr. Danielson, anything additional?

21          MR. DANIELSON:  Yes, Your Honor.

22          The State has admitted that the supremacy clause

23  applies and that the "probable cause" term in that

24  statute is removed.  Under Oregon law, if the remaining

25  parts of a statute remain after part of it is considered

1  unconstitutional, it can't continue if the original

2  intent of the Legislature is not there.

3        Under Oregon law 431.966, the whole purpose of

4  that statute, it says, "Pursuant to a valid court order,

5  based on probable cause and issued at the request of a

6  federal, state, or local law enforcement agency engaged

7  in an authorized drug investigation involving a person to

8  whom the requested information pertains" -- the whole

9  purpose is for a Court to determine, based on all the

10 specific facts and circumstances, that there is probable

11 cause.

12        If you remove that "probable cause" term, there

13 is nothing for the Court to do.  It would see an order

14 from an agency asking for information.  There would be

15 nothing for the Court to do, nothing for the Court to

16 weigh.  And so we do believe it is preempted.

17        THE COURT:  Mr. Wessler?

18        MR. WESSLER:  Our position is that this Court

19 doesn't need to even engage in the preemption question

20 because the application of the statute by the DEA does

21 violate the Fourth Amendment and is unconstitutional, and

22 so as I think we -- we discussed at enough length, it can

23 preempt nothing.

24        So I'd like to respond to a couple points and

25 then make just a few more points about the Fourth

1    Amendment privacy interest and the application of the
2    Fourth Amendment here.

3          First, just to respond and maybe put our own
4    finer point on -- on Ms. Potter's point that that limits
5    on subpoenas are fact specific, that is true, I think.
6    But I think it's true in two separate respects, both of
7    which may be relevant here.

8          As to that reasonableness inquiry under the
9    Fourth Amendment, when a warrant is not required, then
10   that -- that will certainly be fact specific in looking
11   to how broad a request it is, how burdensome it would be
12   to comply with.

13         But what's relevant to the substantive Fourth
14   Amendment issue here is the nature of the records at
15   issue; and that's fact specific in the sense that we're
16   talking about prescription records in the PDMP, and all
17   the facts in the record about those are before the Court.
18   And the Court is quite appropriate, I think, to -- to
19   reach a decision about the proper applicability of
20   administrative subpoenas to those kinds of records.

21         You know, the home is a private space for
22   purposes of the Fourth Amendment.  A warrant is required.
23   But when Courts are reviewing searches of the home
24   without a warrant, Courts have never looked to whether
25   the Government is seeking a diary or a firearm or a kilo

1  or cocaine.  The determination is, at the first stage,

2  whether there's a reasonable expectation of privacy in

3  that location or in the item to be searched.  And if

4  there is, the warrant requirement applies.

5         The second point is just to -- to turn for a

6  moment back to the distinction between the Fourteenth

7  Amendment and the Fourth Amendment cases, *Whalen* and its

8  progeny under the Fourteenth Amendment, and *Ferguson* and

9  all the other cases, like *Katz*, that have -- have in

10 great detail over the years set out the reasonable

11 expectation of privacy test.

12        The Fourth Amendment applies to situations where

13 the Government is engaging in a particularized criminal

14 investigation.  The types of exercises of state power are

15 quite different in the two contexts, quite different when

16 on the one hand a state is gathering together records for

17 some kind of administrative purpose or a public interest

18 purpose -- here to advance public health by providing

19 tools to doctors and pharmacists -- versus when the State

20 is engaging in particular criminal law inquiries into a

21 person's conduct and infringing their privacies in that

22 than context.

23        That is exactly the harm or the dynamic that the

24 Fourth Amendment was intended to address, and that is why

25 the Fourth Amendment requires that the Government must go

1    to a neutral magistrate, demonstrate probable cause, and

2    obtain a warrant permitting them to enter into the space

3    or to seize the records that are private.

4           On the Fourth Amendment analysis, you know, I

5    think we've, between the briefs and this morning, touched

6    enough on the reasons why the information we're talking

7    about is private Fourth Amendment purposes.  But I just

8    want to -- to address for a moment the argument that the

9    DEA makes under the third-party doctrine, suggesting

10    that -- that the mere fact that a person has gone to

11    their physician and shared private medical information

12    with their physician in a privileged and confidential

13    communication and then taken the physician's confidential

14    medical advice to the pharmacist to get necessary medical

15    care, and then that pharmacist is compelled by statute to

16    report that information to a secure safe database, with

17    clear limits on dissemination and law enforcement use,

18    that does nothing to erode the patient's subjective or

19    objective reasonable expectation of privacy in their

20    prescription records.

21          And I think the idea that a person must choose

22    between protecting their health and protecting their

23    privacy is wrong and is frankly offensive to the entire

24    purpose of the Fourth Amendment.

25          So *United States v. Miller* is the case that the

1    Government cites, the DEA cites in support of its

2    argument that the third-party doctrine applies.  And

3    *Miller* directs two dimensions of inquiry, to determine

4    whether the mere fact that a third party has possession

5    or access to records eliminates somebody's privacy

6    interest in them.  The first is how private the

7    information is and the second is whether it was

8    voluntarily shared.

9         And this case is -- even assuming that *Miller* is

10   still good law in today's increasingly digital age -- and

11   the Supreme Court has called that into question in *Jones*

12   and other cases -- but even assuming that it is, it's

13   distinguishable on both of those dimensions.

14        As we've discussed, the kind of records are

15   extraordinarily private, revealing the most sensitive

16   medical facts.  And, importantly, *Miller* itself, in

17   footnote 4 of the opinion, explains that information

18   covered by evidentiary privilege -- the example it gives

19   is the attorney-client privilege, but the doctor-patient

20   privilege is equally apt -- information covered by an

21   evidentiary privilege is simply outside the scope of the

22   Court's opinion.

23        You know, I think it's common sense that a person

24   who goes to their attorney, shares confidential

25   information, which the attorney then writes down in his

1   or her business records and stores in their filing

2   cabinet, it's still considered private for Fourth

3   Amendment purposes, and the Ninth Circuit has held as

4   much.

5           We cite -- the case is *DeMassa v. Nunez*, which

6   the Ninth Circuit decided and explained just that, that

7   the mere fact that a physician holds client records --

8   I'm sorry, that an attorney holds client records doesn't

9   eliminate the privacy interest.  The same must be true of

10  the confidential medical records at issue here.

11          On the other dimension, whether the information

12  is voluntarily shared, it's also distinguishable, I

13  think.  You know, a person going to a doctor to obtain

14  necessary medical care, to a physician to get a

15  prescription to treat the problem hasn't given up

16  anything by -- by seeking that aid.

17          THE COURT:  Okay.  I thank you.  And we'll take

18  the matter under advisement and hopefully getting a

19  ruling out fairly soon.

20          We'll be in recess.

21          MR. WESSLER:  Thank you, Judge.

22          MS. POTTER:  Thank you, Your Honor.

23          MR. DANIELSON:  Thank you.

24

25          (Proceeding concluded.)

--oOo--

     I certify, by signing below, that the

foregoing is a correct transcript of the record

of proceedings in the above-titled cause.  A

transcript without an original signature,

conformed signature or digitally signed signature

is not certified.


*/s/ Nancy M. Walker*                    *3/12/14*
_____    _____
NANCY M. WALKER, CSR, RMR, CRR       DATE
Official Court Reporter
Oregon CSR No. 90-0091